ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

## Case No. 10-7168

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

### METROIL, INC.,

Plaintiff-Appellant,

v.

### EXXONMOBIL OIL CORPORATION,
### EXXON MOBIL CORPORATION, and
### ANACOSTIA REALTY, LLC,

Defendants-Appellees.

---

On Appeal from the
United States District Court for the District of Columbia

---

BRIEF OF DEFENDANTS-APPELLEES
EXXONMOBIL OIL CORPORATION and
EXXON MOBIL CORPORATION

---

Mark A. Klapow (Bar No. 474646)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel. (202) 624-2975
Fax (202) 628-5116
MKlapow@crowell.com

*Attorney for Defendants-Appellees*
*ExxonMobil Oil Corporation and Exxon Mobil Corporation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Local Rule 28(a)(1), Defendants-Appellees ExxonMobil Oil Corporation and Exxon Mobil Corporation certify the following:

### A.     Parties and Amici

All parties, intervenors, and amici appearing before the United States District Court for the District of Columbia and in this Court are listed in the Brief for Plaintiff-Appellant, Metroil, Inc.

### B.     Rulings Under Review

References to the rulings at issue appear in the Brief for Plaintiff-Appellant, Metroil, Inc.

### C.     Related Cases

There is one case involving the same defendants and substantially the same issues – *D.C. Oil, Inc., v. ExxonMobil Oil Corp. et al.*, No. 1:10-CV-00947-RMU, (D.D.C. filed June 8, 2010). There was another case involving the same defendants and substantially the same issues – *Alina Ent. et al. v. ExxonMobil Oil Corp., et al.*, No. 2010-CA-004228 (D.C. Super. filed June 7, 2010). That case was dismissed during the pendency of this appeal.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Local Rule 26.1(a), Defendants-Appellees ExxonMobil Oil Corporation and Exxon Mobil Corporation state as follows:  ExxonMobil Oil Corporation is wholly owned by Exxon Mobil Corporation, which is a publicly traded company.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ................................................................................i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF CONTENTS................................................................... iii

TABLE OF AUTHORITIES ..............................................................iv

GLOSSARY OF ABBREVIATIONS ....................................................vi

STATUTES AND REGULATIONS .................................................... vii

STATEMENT OF THE FACTS .......................................................... 1

SUMMARY OF THE ARGUMENT ..................................................... 2

ARGUMENT ................................................................................... 4

   I.    THE ACT DOES NOT APPLY TO THIS TRANSACTION ........................ 4

        A.   A Statutes Does Not Operate Retroactively In The Absence Of
            Retroactive Intent That Is Expressed Clearly In The Statute ...............5

        B.   The Act's Savings Clause Does Not Express Retroactive Intent .........8

        C.   The Failed Subsequent Resolution Provides No Basis To Find
            Retroactivity Here ...........................................................10

  II.    METROIL'S CIVIL CONSPIRACY CLAIM CANNOT STAND.............13

  III.   THERE WAS NO NONRENEWAL UNDER THE PMPA........................13

  IV.   THE FRANCHISE AGREEMENT WAS LAWFULLY ASSIGNED ........17

CONCLUSION .................................................................................23

CERTIFICATE OF COMPLIANCE.....................................................24

# TABLE OF AUTHORITIES

**CASES**:

*Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353 (D. Conn. 1989)................................20

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .................................................4

*Barnes v. Gulf Oil Corp.*, 795 F.2d 358 (4th Cir. 1986)...........................................21

*Beachler v. Amoco Oil Co.*, 112 F.3d 902 (7th Cir. 1997) ....................................19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).......................................21

*Cedar Brook Serv. Station, Inc. v. Chevron U.S.A., Inc.*,
    746 F. Supp. 278 (E.D.N.Y. 1990) ........................................................20

*Coast Village, Inc. v. Equilon Enters., LLC*,
    163 F. Supp. 2d 1136 (C.D. Cal. 2001) ................................................16

*Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102 (1980) .............11

*Davis v. Gulf Oil Corp.*, 485 A.3d 160 (D.C. 1984)....................................14, 15, 17

*Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846 (7th Cir. 2002).........14, 15, 16

*Flack v. Laster*, 417 A.2d 393 (D.C. 1980) ...............................................17

*Garcia v. B.P. Prods. N. Am.*,
    No. 09-2675, 2009 WL 2474623 (7th Cir. Aug. 13, 2009)...............................15

*General Motors Corp. v. Romein*, 503 U.S. 181 (1992)............................................5

*Hall v. Clinton*, 285 F.3d 74 (D.C. Cir. 2002) .........................................13

*Holzsager v. Dist. of Columbia Alcoholic Beverage Control Bd.*,
    979 A.2d 52 (D.C. 2009) ..............................................................5, 6

*In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213 (D.C. Cir. 2010) ..............4

iv

*Kalaris v. Donovan*, 697 F.2d 376 (D.C. Cir. 1983) ................................................. 11

*Korangy v. Mobil Oil Corp.*, 84 F. Supp. 2d 660 (D. Md. 2000) ............................ 16

*\*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)............................5, 6, 8, 10, 12

*\*Mac's Shell Serv., Inc. v. Shell Oil Prods.*,
130 S. Ct. 1251 (2010) ............................................................................1, 2,13, 15, 16

*\*May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917 (6th Cir. 1988) .........20

*Riverdale Enters. v. Shell Oil Co.*, 41 F. Supp. 2d 56 (D. Mass. 1999) .................16

*Scholtz P'Ship v. Dist. of Columbia Rental Accommodations Comm'n*,
427 A.2d 905 (D.C. 1981) ..................................................................................... 6, 7

*Stromberg Sheet Metal Works v. Wash. Gas Energy Sys., Inc.*,
448 F. Supp. 2d 64 (D.D.C. 2006) ..........................................................................17

*Wilson v. Amerada Hess Corp.*, 773 A.2d 1121 (N.J. 2001)..................................22

**STATUTES**:

15 U.S.C. § 2801(14) ...............................................................................................13

D.C. Code Ann. § 28:2-210(2)...................................................................18, 19, 21

D.C. Code Ann. § 36-304.11 ................................................................................1. 4

D.C. Code Ann. § 36-304.15 ....................................................................................8

*Authorities on which ExxonMobil chiefly relies upon are marked with asterisks.

# GLOSSARY OF ABBREVIATIONS

"Br." = Brief

"J.A." = Joint Appendix

"PMPA" =  Petroleum Marketing Practices Act

## STATUTES AND REGULATIONS

Except for 15 U.S.C. § 2801 and D.C. Code Ann. § 28-2:210(2), included in the Addendum to this Brief, all applicable statutes and regulations are contained in the Brief for Plaintiff-Appellant, Metroil, Inc.

## STATEMENT OF THE FACTS

The salient facts for this appeal are neither complicated nor numerous.[1]

ExxonMobil had a franchise contract with Metroil to operate a retail station at

2708 Virginia Avenue NW, at the corner of Rock Creek Parkway. (J.A. at 11,

178.) That contract expressly allowed ExxonMobil to assign its rights without

limitation. (*Id.* at 209.) As part of its nationwide divestiture of its stations, in June

2009, ExxonMobil closed its sale of Metroil's station and assigned its franchise

contract to Anacostia. (*Id.* at 12, 14.) Metroil then continued to operate an Exxon-

branded station at that site under contract with Anacostia. (*Id.* at 15-16.) On July

18, 2009, the D.C. Retail Service Station Amendment Act (the "Act") became law.

D.C. Code Ann. § 36-304.11.

In September 2009, Metroil sued in D.C. District Court raising five counts.[2]

(J.A. at 9-23.) Defendants moved to dismiss. (J.A. at 24-25, 163-64.) After this

and two additional rounds of briefs – one to address the intervening Supreme Court

*Mac's Shell* opinion (*see supra*) and one to address the failed subsequent resolution

---

[1] Metroil's protracted factual statement and history of this case are neither accurate
nor relevant. But ExxonMobil does not believe that a point-by-point refutation of
Metroil's facts is necessary, or that doing so would help this Court to decide the
straightforward issues this appeal presents.

[2] To no one's surprise, Plaintiff's counsel later filed identical complaints (without
PMPA claims) for other Exxon-branded franchisees in the District of Columbia.
Thus, Metroil is a "test case."

– Judge Urbina granted the motion. (J.A. at 521.) Metroil moved to reconsider,

lost, and then appealed its claims, save Count III – a constructive termination claim

of which *Mac's Shell* was clearly dispositive. (J.A. at 481-83, 518-21, 522-23.)

## SUMMARY OF THE ARGUMENT

This Court should affirm Judge Urbina in dismissing all counts:

First, Judge Urbina was correct in dismissing Count I because the D.C.

Retail Service Station Amendment Act (the "Act") does not apply to the sale of

Metroil's station. The Act became law on July 18, 2009. There is no dispute that

ExxonMobil sold the station at which Metroil operates to Anacostia more than a

full month earlier. Because the Act does not clearly express retroactive intent, the

Act does not apply retroactively and, therefore, does not apply to this transaction.

Metroil's reliance on the Act's savings clause is misplaced, as Judge Urbina

correctly held. By its own terms, the Act's savings clause defines for exclusion a

station sale pursuant to a contract that predates April 1, 2009, no matter when the

sale actually closed (even after the effective date of the Act). The savings clause,

thus, simply does not address the issue Metroil raised here – whether a transaction

concluded before the effective date of the Act was to be nullified by the Act.

Metroil also cannot rely upon a failed subsequent resolution purporting to

graft retroactive intent into the Act. The decisional law is clear that retroactive

intent must be expressed in the legislation itself. Moreover, failed subsequent

2

legislation is an extremely hazardous basis from which to infer legislative intent. Finally, as Judge Urbina correctly pointed out, the fact that the sponsor of the Act felt the need to subsequently introduce a resolution seeking to clearly express retroactive intent is only proof that the Act itself did not. If the Act had expressed such intent in the first place, there would have been no purpose for the resolution.

Second, Judge Urbina was correct in dismissing Count II for civil conspiracy because that claim is wholly dependent on Count I.

Third, Judge Urbina was correct in dismissing Count IV for "nonrenewal" under the Petroleum Marketing Practices Act ("PMPA") because Metroil did not suffer a "nonrenewal" as defined by the statute. The PMPA defines "nonrenewal" in terms of "the franchise relationship," not the franchise contract. As courts across the country have held, this distinction was purposeful. The franchise relationship, as opposed to the franchise contract, is only the three pillars of the PMPA – *i.e.*, that the franchisor permit the franchisee to use the trademarks, purchase fuel, and lease the station. There is no dispute that those three pillars were intact when ExxonMobil assigned the station (and are intact today). Because the franchise relationship continued, ExxonMobil did not "nonrenew" Metroil.

Fourth, Judge Urbina was correct in dismissing Count V for contract breach. Metroil's PMPA agreement expressly allowed ExxonMobil to assign that contract without limitation. Metroil offers no reason why an assignment expressly allowed

3

by agreement should somehow be barred as inconsistent with the premises of that agreement, and Metroil fails to identify any decision in any jurisdiction in which any court barred assignment based on the kinds of arguments advanced here.

## ARGUMENT

In order to survive a Rule 12 motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)). Plausibility requires the complaint to include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the general rule is to accept as true the allegations in the complaint, the Court is not required to accept implausible assertions or conclusory allegations. *Id.*

## I.     THE ACT DOES NOT APPLY TO THIS TRANSACTION.

The Act became effective on July 18, 2009. D.C. Code Ann. § 36-304.11. Metroil admits this, as it must, but then points out that the Act was raised in Committee and in the D.C. Council before that, and that the Mayor signed the Act on May 20, 2009. As this Court is no doubt well aware, those events do not control the effective date of legislation in the District of Columbia.

4

Given the admitted transaction date for the sale of Metroil's station and the (later) effective date of the Act, it has no application here to nullify the PMPA agreement lawfully executed, unless the act applies retroactively.  It does not.

### A.    A Statute Does Not Operate Retroactively In The Absence Of Retroactive Intent That Is Expressed Clearly In The Statute.

It is well settled that a statute will not operate retroactively absent express contrary intent stated in the statute. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994) ("[E]nactments…will not be construed to have retroactive effect unless their language requires this result.") (emphasis added); *Holzsager v. Dist. of Columbia Alcoholic Beverage Control Bd.*, 979 A.2d 52, 56-57 (D.C. 2009) (holding that, absent an express statement that the statute is retroactive, it operates only prospectively).  As explained by the Supreme Court, "the presumption against retroactive legislation is deeply rooted in our jurisprudence" because "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 265; *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) ("Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions.").

5

Metroil's claim that *Holzager v. D.C. Alcoholic Beverage Control Board* and *Scholtz Partnership v. D.C. Rental Accommodations Commission* set forth a different standard, and mandate retroactive application of the Act here, is wrong. To the contrary, those two cases simply demonstrate that D.C. law tracks closely the longstanding principles of statutory construction set forth in *Landgraf*.

*Holzsager* addressed the retroactive application of a procedural rule to end the use of referenda to challenge alcohol sales licenses. Far from abandoning it, that court readily acknowledged the "traditional presumption" against retroactivity "absent clear [legislative] intent favoring such a result." 972 A.2d at 57. That court decided the presumption did not apply to that case because no vested rights were implicated, the dispute was not between private parties (one was a public entity), and the procedural rule at issue was not substantive in nature. *Id.* The case at bar shares none of these features. Indeed, the *Holzsager* court went on to caution against reading that decision broadly: "[I]n cases between private individuals, involving legislation that purely affects the individual rights of two private parties vis-à-vis one another, a court ought not to struggle greatly to avoid a construction of the law which would affect the rights of the parties." *Id.* *Holzsager*, therefore, furnishes no basis to deviate from the standard presumption against retroactivity that controls this case.

6

*Scholtz Partnership* dealt with retroactive application of the standards used in rent control statutes. Metroil cites the case in support of retroactive application of a statute if doing so would better "achieve the intended objective" of remedial legislation (Appellant Br. at 21.), but that claim has no basis in the *Scholtz* case. Rather, the opposite is true. Four D.C. landlords filed hardship applications for rent increases under 1975 standards that were set to expire and be replaced by more demanding standards. *Scholtz P'ship v. D.C. Rental Accommodations Comm'n*, 427 A.2d 905, 912-13 (D.C. 1981). Under the 1975 standards, an applicant was entitled to a decision on its request within 60 days. *Id.* at 909. With respect to the one landlord that had applied for an increase more than 60 days before the 1975 standards expired, the court held the landlord had a vested right to a decision under the old standards in the absence of express retroactive intent in the new standards, which was absent. *Id.* at 917. *Scholtz* is, thus, consistent with the decision below. Metroil focuses on landlords that applied days before the old standards expired, but those landlords were not entitled to a decision under the old standards, which gave the governing authority 60 days to decide, and therefore had no vested rights. *Id.* at 918. Their situation is not analogous to ExxonMobil's situation here, in which the sale had already closed before the Act became effective.

7

Notably, the Supreme Court has made clear that in light of the important interests at stake, general invocations of statutory purpose or remedial intent are insufficient to overcome the basic presumption against retroactivity. As the Supreme Court held in a case with far more compelling interests at stake than this one: "It will frequently be true, as petitioner and *amici* forcefully argue here, that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity." *Landgraf*, 511 U.S. at 285-86. To the contrary, for a statute to be held to have a purpose broad enough to be given retroactive effect, the statute must reflect that intent and that purpose on its face. The Act does not.

### B.     The Act's Savings Clause Does Not Express Retroactive Intent.

Metroil's attempt to glean retroactive effect and intent from the Act's savings clause does not work. To the contrary, it demonstrates that the Council knew that it had to deal with retroactivity issues, but did not enact any provision that would aid Metroil.

The Act has a savings clause that excludes certain transactions: The Act "shall not apply to any sale … made pursuant to a contract which has been executed … prior to April 1, 2009." D.C. Code Ann. § 36-304.15. Metroil asks the Court to invert the meaning of that clause, and interpret it to mean that the Act

8

apply to all contracts entered into after April 1, 2009. But that is not what the clause says.[3]

Nor is that a plausible inference. The savings clause expressly excludes certain transactions ("shall not apply to …"). Metroil's interpretation, however, would transform the savings clause into a provision defining inclusion. That is not proper as a matter of statutory interpretation. Rather, the Act's savings clause addresses transactions in which the contract of sale was executed before April 1, 2009, but delivery was delayed for some reason until after the Act's effective date. The savings clause simply does not address all sales that close after April 1, 2009, as Metroil argues.

Neither does the savings clause reflect some unstated amorphous intention to subject all sales that closed after April 1, 2009, to the Act. Metroil suggests that because the Council was concerned about excluding transactions concluded after the effective date from the Act if first agreed upon before April 1, 2009, then the

_____

[3] That reading is consistent with the legislative history Metroil shows the Court. The Council was concerned that, absent a savings clause, the Act could be ruled unconstitutional because it would abrogate vested property rights conferred by contract and interfere with the reasonable expectations of parties to a sales contract where the contract predated the date of enactment, but the transaction had not closed after the effective date. (J.A. at 61.) In order to avoid that issue, the savings clause excluding transactions made pursuant to contracts that predated April 1, 2009 -- regardless of when the transaction closed -- was added to the Act prior to passage. (*Id.*)

9

failure to also expressly exclude transactions concluded after April 1, 2009, but before the effective date, means that the Council intended to subject such sales to the Act. But this theory turns the presumption against retroactivity on its head. The Council had to expressly exclude those transactions that were made subject to the savings clause because those transactions would, if concluded after the effective date, otherwise be subject to the Act. But transactions concluded before the effective date are simply not subject to the Act, and thus there was no need for the Council to expressly exclude them.

### C.    The Failed Subsequent Resolution Provides No Basis To Find Retroactivity Here.

Metroil's attempt to show retroactive intent based on a failed subsequent resolution not only falls short, it shows just the opposite.[4] As a preliminary matter, retroactive intent must be expressed in the statute itself. *Landgraf*, 511 U.S. at 264 ("[E]nactments … will not be construed to have retroactive effect unless their language requires this result."). Legislative history cannot prove retroactive intent. And proposed subsequent legislation, never enacted, cannot prove intent.

Indeed, it has long been recognized that subsequent legislation is inherently unreliable and will rarely provide an overriding explanation when the statute is

---

[4] Metroil's point that Council members who voted for the Act also voted for the subsequent resolution is not relevant. The resolution did not get the votes to pass and, thus, is not the law.

clear on its face. *Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 118 (1980). And if subsequent legislation and legislative history is unreliable, then unenacted subsequent legislation provides an extremely "hazardous basis for inferring the meaning of a congressional enactment." *Kalaris v. Donovan*, 697 F.2d 376, 392 n.65 (D.C. Cir. 1983) (quotation omitted).

Metroil's attempt to distinguish *Kalaris* is unavailing because the differences Metroil seeks to focus on are not relevant to the holding. In *Kalaris*, this Court examined whether the Secretary of Labor could involuntarily remove members of the Department of Labor Benefits Review Board when the relevant statute was silent on the issue. 697 F.2d at 380-81. As part of its inquiry, the Court considered but declined to infer anything from a failed subsequent amendment, and expressly cautioned against reliance on subsequent non-enacted legislation. *Id.* at 392-93. Metroil's point that the failed subsequent legislation in *Kalaris* did not purport to interpret the original legislation, and the failed resolution here did, is irrelevant to the underlying holding there, and the dispositive rule here, that the Court may not rely on failed subsequent legislation to infer intent. This is more true where, as here, that intent must be clear and expressed for retroactive application.

Moreover, even if the Court considers the failed subsequent legislation here, as Judge Urbina correctly noted (J.A. at 521), the fact that the Act's sponsor felt it necessary to introduce a resolution to "clarify" that the Act applied retroactively is

11

only proof that the Act as passed did not express clear retroactive intent. Had it, the later resolution would have been unnecessary. If anything can be inferred from the resolution, therefore, it is that Council members who voted for it agreed that: "In the absence of emergency action by the Council, there is a substantial risk that the Council's intent to protect the reasonable expectations of franchisees will be frustrated" – *i.e.*, the Act would not apply to ExxonMobil's transfer of the station operated by Metroil and others in June 2009. (J.A. at 455.) In any event, the resolution failed.

Metroil's last gasp argument that retroactive application of the Act is needed in the interest of "substantial justice" because there was "urgent need" for the Act and it would "ensure that important services would be preserved for all District Residents" also does not work. (Appellant Br. at 21, 22, 24.) It is often true, of course, that granting a statute retroactive effect would more fully vindicate its purpose. But this is not a sufficient basis for retroactive application. *Landgraf*, 511 U.S. at 285-86. The question is whether the legislature would have wished to vindicate that purpose even if it were to upset completed transactions. And the answer to that question can only be found by reading the language of the enactment and determining whether the enacting body has clearly expressed an intention to do so. With respect to the Act, the D.C. Council did not.

\* \* \* \* \*

12

Accordingly, there is no basis in the statute, legislative history, or policy to apply the Act retroactively.

## II.    METROIL'S CIVIL CONSPIRACY CLAIM CANNOT STAND.

Metroil's derivative claim for civil conspiracy relies entirely on the Act and, thus, also fails. Moreover, in D.C., "civil conspiracy is not actionable in and of itself but serves instead 'as a devise through which vicarious liability for the underlying wrong may be imposed upon all who are a party to it.'" *Hall v. Clinton*, 285 F.3d 74, 82 (D.C. Cir. 2002). Because it seeks to impose direct liability on ExxonMobil under the Act, Metroil cannot, as a civil conspiracy claim, also seek to impose vicarious liability for the same conduct.

## III.    THERE WAS NO NONRENEWAL UNDER THE PMPA.

Metroil's claim that it has been "nonrenewed" because its franchise contract expired misstates the law. Whereas the PMPA defines "termination" as ending "the franchise," the PMPA defines "nonrenewal" as "failure to reinstate, continue, or extend *the franchise relationship*." 15 U.S.C. § 2801(14) (emphasis added). The significance of this distinction has been uniformly and repeatedly recognized, including by the United States Supreme Court last year. *Mac's Shell Serv., Inc. v. Shell Oil Prods.*, 130 S. Ct. 1251, 1263 (2010) (holding franchisors must "renew only the 'franchise relationship' as opposed to the same franchise agreement").

The PMPA is further clear that the franchise relationship remains intact so long as all three statutory pillars of a franchise are present: use of the trademark, purchase of fuel, and lease of the station. *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 860 (7th Cir. 2002) ("[W]hen a franchisee alleges that a franchisor has 'failed to renew the parties' franchise relationship, it must demonstrate that at least one of the three essential components of a petroleum franchise has been discontinued."); *Davis v. Gulf Oil Corp.*, 485 A.3d 160, 167 (D.C. 1984) ("[R]egardless of when the franchise agreement is scheduled to expire, it would defy the common meaning of the words to say that nonrenewal has taken effect as long as the franchisor willingly permits the franchisee to maintain possession of the premises and continues to supply the franchisee with gasoline pursuant to the agreement."). Because the three statutory pillars remain intact here, Metroil has no claim for nonrenewal.

At the heart of Metroil's confusion is its failure to differentiate between the "franchise relationship" and a franchise contract. The two concepts are distinct -- the former exists so long as the three statutory pillars are in place; the latter is just the written agreement. Nonrenewal occurs only when the "franchise relationship" is ended, not when the franchise contract expires without a new contract in place.

Metroil engages in misdirection in pointing to other clauses in the contract. The PMPA itself defines "nonrenewal" and that definition cannot be amended by

14

anything in the franchise contract. The fact that the contract has an expiration date and specifies that any temporary extension is not a renewal is not germane to the purely statutory question: Whether "the franchise relationship" is still intact.

The Seventh Circuit focused on this issue in *Garcia v. B.P. Products North America*, No. 09-2675, 2009 WL 2474623 (7th Cir. Aug. 13, 2009). Before expiration, the franchisor sent the franchisee a letter purporting to extend the franchise agreement by one month. *Id.* at *1. The franchisee sued claiming the extension constituted a termination or nonrenewal. *Id.* The Court affirmed dismissal holding that it was neither – not a "termination" because the letter did not end the contract and not a "nonrenewal" because the franchisee continued to enjoy the three pillars: use of the trademarks, buying motor fuel, and occupying the station. *Id.* at *2-3.

Metroil's argument that the *Mac's Shell, Dersch Energies*, and *Davis* cases do not control or are to the contrary misstates those decisions:

Metroil's claim that the Supreme Court in *Mac's Shell* held that a franchisee in Metroil's shoes will have "a surefire claim for unlawful non-renewal" misstates the unanimous opinion of the Supreme Court. (Appellant Br. at 31). In *dicta*, the Court considered a hypothetical in which the franchisor breached the three pillars without providing the statutorily required notice. *Mac's Shell*, 130 S. Ct. at 1263 n.12. In quoting from that case, Metroil has cut out the part of the sentence that

15

distinguishes that hypothetical from the case at bar, the elimination of one of the statutory pillars: "But in that circumstance, a franchisee would not only have a surefire claim for nonrenewal, but also presumably could seek a preliminary injunction forcing the franchisor *to resume providing the franchise elements for the duration of the litigation.*" *Id.* (emphasis added). There is no dispute here that the three pillars were intact. And, as shown, it is the failure of one of the three pillars on which a nonrenewal turns.

Metroil attempts to rebut *Dersch Energies* by refuting holdings that Judge Urbina did not make. Judge Urbina did not hold, as claimed, that the franchisee's continued operation is an "absolute bar" to PMPA nonrenewal claims. (Appellant Br. at 33.) The cases cited by Metroil that undercut this proposition,[5] thus, are not relevant. To the contrary, Judge Urbina held there is no nonrenewal as long as the franchise relationship – the three pillars – are intact. (J.A. at 476.)

Judge Urbina also did not condone threatening termination or nonrenewal. (Appellant Br. at 31.) And there has never been any such claim in this case.

---

[5] *Korangy v. Mobil Oil Corp.*, 84 F. Supp. 2d 660 (D. Md. 2000); *Riverdale Enters. v. Shell Oil Co.*, 41 F. Supp. 2d 56 (D. Mass. 1999); and *Coast Village, Inc. v. Equilon Enters., LLC*, 163 F. Supp. 2d 1136 (C.D. Cal. 2001) all involved situations in which the franchisor improperly conditioned renewal of the agreement on the franchisee's waiver of rights under the PMPA.

Finally, Metroil misstates the holding in the *Davis* case (Appellant Br. at 33-34), which focused on the notice requirements for an acknowledged nonrenewal and not whether or not the franchisee had been nonrenewed in the first place. 485 A.2d at 166. There is nothing in the *Davis* decision that suggests, as Metroil does, that, absent agreement to extend the franchise, there is an actionable "nonrenewal" under the PMPA.

Accordingly, there was no "nonrenewal" as defined by the PMPA.

## IV.   THE FRANCHISE AGREEMENT WAS LAWFULLY ASSIGNED.

In this jurisdiction, the express terms of a contract govern its assignability. *Stromberg Sheet Metal Works v. Wash. Gas Energy Sys., Inc.*, 448 F. Supp. 2d 64, 68-69 (D.D.C. 2006) (applying D.C. law) (upholding assignment based on express terms permitting it). Indeed, even in the absence of an express term allowing assignment, "[t]he right to assign is presumed, based upon the principles of unhampered transferability of property rights and of business convenience." *Flack v. Laster*, 417 A.2d 393, 399 (D.C. 1980). Thus, free assignability of contracts is favored in the District of Columbia.

Metroil's franchise agreement expressly allows ExxonMobil to assign it: "ExxonMobil may transfer or assign all or part of its rights or interest in this Agreement, or delegate all or part of its duties or obligations under this Agreement, without restriction to any person or entity." (J.A. at 209.) Indeed, the franchise

17

contract puts Metroil on notice that the right to assign is "without restriction" and

that an assignment may result in changes affecting the franchisee because the

assigned franchisor may have "policies or programs that differ from ExxonMobil's

policies and programs." (*Id.*)  The franchise contract further puts Metroil on notice

that "this impact is contemplated by the Parties under this Agreement." (*Id.*)

 Metroil's invocation of D.C. Code Ann. § 28:2-210(2), a provision of the

Uniform Commercial Code adopted in the District of Columbia, does not work.

That provision states that "unless otherwise agreed all rights of either seller or

buyer can be assigned" except where "the assignment would materially change the

duty of the other party, or increase materially the burden or risk imposed on him by

his contract, or impair materially his chance of obtaining return performance."

D.C. Code Ann. § 28:2-210(2).

 As an initial matter, it is unclear that § 28:2-210(2) has any application here.

It appears on its face to be a gap-filling provision that prescribes the rule where the

parties have not specifically addressed the issue of assignment.  It is not a clause

that purports to limit the rights of the parties to contract about a particular subject,

here an assignment.  Because the parties agreed that ExxonMobil could "without

restriction" assign its interest even to another party that has policies and practices

different than those of ExxonMobil, there is no gap to fill and the provision that

Metroil shows the Court has no application.

18

Moreover, even if that section could somehow apply here, it would still be Metroil's burden to show that the assignment at issue was significantly and materially beyond anything that Metroil could have contemplated, and agreed to, when it agreed in writing that ExxonMobil's right to assign was without restriction and could be to an entity that has different policies and practices. Given the broad right to assign, and the other rights the franchisor has under the agreement, none of Metroil's four complaints about Anacostia could be construed as fundamentally altering the purpose or structure of the underlying agreement in a manner that might give rise to a claim to invalidate the assignment under § 28:2-210(2).

As other courts have held, the principle purpose of an agreement of the kind at issue here is to sell motor fuel subject to a franchise and the salient question is whether that purpose has been undermined by the assignment:

First, Metroil asserts that Anacostia has charged "excessive" prices for motor fuel. The PMPA contract, however, states that the franchisor can raise prices. (J.A. at 195.) Indeed, the Seventh Circuit considered and rejected precisely this type of claim. *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 908 (7th Cir. 1997) ("[T]he possibility that an assignee-distributor may charge a higher price generally will be insufficient to constitute a material burden.").

Second, Metroil asserts that Anacostia has dictated unreasonable payments terms. But the PMPA contract states that the franchisor can dictate those terms.

19

(J.A. at 196.)  Again, another federal court considered and rejected precisely this claim.  *Cedar Brook Serv. Station, Inc. v. Chevron U.S.A., Inc.*, 746 F. Supp. 278, 283 (E.D.N.Y. 1990) ("Changes made by Cumberland that were within Chevron's prerogative to make are likewise insufficient to show a burden or impairment flowing from the assignment at issue.").

Third, Metroil asserts that Anacostia is incapable of performing adequately because it owns other stations, some of which carry other brands of motor fuel. But two years later, Metroil is still in business.  Here again, another federal court considered and rejected precisely this claim.  *Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353, 363 (D. Conn. 1989) (finding that assignment to a competitor alone was insufficient to constitute a material burden absent evidence that the assignee breached the franchise agreement).

Fourth, Metroil asserts that Anacostia lacks the financial and personnel resources to perform adequately.  Anacostia's principals have operated gas stations for years.  Also, the Sixth Circuit considered and rejected that claim.  *May-Som Gulf*, 869 F.2d 917, 925 (6th Cir. 1988) ("There is nothing-other than the plaintiff's speculations-to suggest [the assignee] will be unable to meet its commitments.").

Metroil has not and cannot offer the Court a single case in *any* jurisdiction that invalidated a franchise assignment as a material impairment on similar or

20

analogous facts.[6]  Rather, in all of the analogous PMPA cases found, the court

upheld assignment absent some evidence of an actual violation of the contract,

which, as shown above, is not even alleged here.

For this reason, Metroil's citation to *Barnes v. Gulf Oil Corp.*, 795 F.2d 358

(4th Cir. 1986), is off base.  In *Barnes*, unlike here or the cases above, the franchise

contract set the price for motor fuel.  Because the assignee charged above the

contract price, the Fourth Circuit affirmed denial of the assignee's summary

judgment motion against the dealer.  *Id.* at 364.  That is the not this case.

Metroil's effort to avoid the same result by arguing that it needs discovery

only proves that dismissal was appropriate.  Federal pleading standards function as

a gatekeeper to discovery and prevent meritless claims from burdening the courts

or defendants.  *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

Simply put, the Federal Rules do not entitle Metroil to discovery because it hopes

to find something actionable.  Absent some coherent theory and plausible evidence

that would render this assignment inconsistent with what Metroil expressly agreed

---

[6] The thrust of Metroil's argument is that ExxonMobil is an enormous well-
respected company and that the assignment to any smaller operator necessarily
changes the nature of the relationship in myriad ways.  But if that were correct, the
stated grant of the right to assign would be rendered a nullity.  It is difficult to
believe that ExxonMobil could readily find an assignee of its same size or with the
same nationwide profile or organization.  Rather, § 28:2-210(2), if it applies at all
where assignment is expressly allowed, has to require a substantial showing of
injury or harm, not mere speculation.

to allow ExxonMobil to do by way of assignment, Metroil is just not entitled to discovery in search of some argument to pursue.

Finally, Metroil now suggests that its breach claim should survive because ExxonMobil breached the duty of good faith and fair dealing in its assignment. This argument was neither pleaded nor advanced below and is, thus, improper.

Further, Metroil provides no explanation at all for its allegation of "bad faith," beyond citing to *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121 (N.J. 2001). But the *Wilson* decision clearly states that "discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance" absent bad faith. *Id.* at 1130. That case involved allegations that the franchisor set prices with the specific intent to run the franchisee out of business. *Id.* at 1131. There is no such allegation here, nor could there be. Indeed, Metroil is still in operation a full two years after assignment. Furthermore, the fact that ExxonMobil assigned several dozen franchises to Anacostia on the same day as Metroil's contract and contemporaneously with over 100 franchises in the Washington, D.C. area, and that ExxonMobil did so as part of a well-publicized effort to sell its dealer network throughout the nation to distributors (J.A. at 12, 14), totally undercut any possible argument that Metroil was specifically targeted and the victim of some undefined and undescribed "bad faith."

Under federal pleading standards, the litigant must do more than incant the term "bad faith"; it must set forth facts that, if true, would meet that high standard. Metroil has not done so.

Accordingly, there is no actionable breach of contract.

## CONCLUSION

For these reasons, this Court should affirm Judge Urbina on all counts.

Respectfully submitted,

/s/ Mark A. Klapow

Mark A. Klapow (Bar No. 474646)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2975
Fax: (202) 628-5116
MKlapow@crowell.com

*Attorney for Defendants-Appellees
ExxonMobil Oil Corporation and
Exxon Mobil Corporation*

Dated: July 18, 2011

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a), I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) because this brief contains 5,410 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  This brief also complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman.

/s/ Mark A. Klapow
Mark A. Klapow

*Attorney for Defendants-Appellees*
*ExxonMobil Oil Corporation and*
*Exxon Mobil Corporation*

Dated: July 18, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of July, 2011, I electronically filed a copy of the foregoing Brief of Defendants-Appellees ExxonMobil Oil Corporation and Exxon Mobil Corporation with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered users:

Peter H. Gunst
ASTRACHAN GUNST THOMAS RUBIN, P.C.
217 East Redwood Street
Suite 2100
Baltimore, MD 21202
Tel: (410) 783-3550
Fax: (410) 783-3530
pgunst@agtlawyers.com

*Attorney for Plaintiff-Appellant Metroil, Inc.*

Alphonse M. Alfano
BASSMAN, MITCHELL & ALFANO
1707 L Street, NW
Suite 560
Washington, DC 20036-4223
Tel: (202) 466-6502
Fax: (202) 331-7510
bma@bmalaw.net

*Attorney for Defendant-Appellee Anacostia Realty, LLC*

I further certify that two copies of the foregoing document were served this 18th day of July, 2011, by Federal Express, upon the above addresses.

/s/ Mark A. Klapow
Mark A. Klapow

# ADDENDUM

15 U.S.C. § 2801 ...................................................................................1

D.C. Code Ann. § 28-2:210(2)...............................................................4

REFERENCES IN TEXT

The Clean Air Act, referred to in subsec. (b), is act July 14, 1955, ch. 360, 69 Stat. 322, as amended, which is classified generally to chapter 85 (§7401 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of Title 42 and Tables.

The Noise Control Act of 1972 (42 U.S.C. 4901 et seq.), referred to in subsec. (b), is Pub. L. 92–574, Oct. 27, 1972, 86 Stat. 1234, as amended, which is classified principally to chapter 65 (§4901 et seq.) of Title 42. For complete classification of this Act to the Code, see Short Title note set out under section 4901 of Title 42 and Tables.

## § 2707. Patents and inventions; statutory provisions applicable; contracts or grants covered

Section 5908 of title 42 shall apply to any contract (including any assignment, substitution of parties, or subcontract thereunder) or grant, entered into, made, or issued by the Secretary of Energy under this chapter.

(Pub. L. 95–238, title III, §308, Feb. 25, 1978, 92 Stat. 82.)

## § 2708. Comptroller General audit and examination of books, etc.; statutory provisions applicable; contracts or grants covered

Section 5876 of title 42 shall apply with respect to the authority of the Comptroller General to have access to and rights of examination of books, documents, papers, and records of recipients of financial assistance under this chapter; except that for the purposes of this chapter, the term "contract" (as used in section 2206 of title 42, insofar as it relates to such section 5876 of title 42) means "contract or grant".

(Pub. L. 95–238, title III, §309, Feb. 25, 1978, 92 Stat. 82.)

## § 2709. Reports to Congress by Secretary of Energy

### (a) Comprehensive program, etc.

As a separate part of the annual report submitted under section 5914(a)[1] of title 42 with respect to the comprehensive plan and program then in effect under section 5905(a) and (b) of title 42, the Secretary of Energy shall submit to Congress an annual report of activities under this chapter. Such report shall include—

(1) a current comprehensive program definition for implementing this chapter;

(2) an evaluation of the state of automobile propulsion system research and development in the United States;

(3) the number and amount of contracts and grants made under this chapter;

(4) an analysis of the progress made in developing advanced automobile propulsion system technology; and

(5) suggestions for improvements in advanced automobile propulsion system research and development, including recommendations for legislation.

### (b) Study on financial obligation guarantees

The Secretary of Energy shall conduct a survey of developers, lending institutions, and other appropriate persons or institutions and

[1] See References in Text note below.

shall otherwise make a study for the purpose of determining whether, and under what conditions, research, development, demonstration, and commercial availability of advanced automobile propulsion system technology may be aided by the guarantee of financial obligations by the Federal Government. The Secretary of Energy shall report the results of such survey and study to the Congress within 1 year after February 25, 1978. Such report shall include an examination of those stages of advanced automobile propulsion system technology research, development, demonstration, and commercialization for which financial obligation guarantees may be useful or appropriate and shall contain such legislative recommendations as may be necessary.

(Pub. L. 95–238, title III, §310, Feb. 25, 1978, 92 Stat. 83.)

REFERENCES IN TEXT

Section 5914 of title 42, referred to in subsec. (a), was omitted from the Code.

## § 2710. Authorization of appropriations

There is authorized to be appropriated to carry out the purposes of this chapter, in addition to any amounts made available for such purposes pursuant to title I of this Act, the sum of $12,500,000 for the fiscal year ending September 30, 1978.

(Pub. L. 95–238, title III, §312, Feb. 25, 1978, 92 Stat. 83.)

REFERENCES IN TEXT

Title I of this Act, referred to in text, is title I (§§101–107) of Pub. L. 95–238, Feb. 25, 1978, 92 Stat. 47. For complete classification of this title to the Code, see Tables.

## CHAPTER 55—PETROLEUM MARKETING PRACTICES

### SUBCHAPTER I—FRANCHISE PROTECTION

| Sec. | |
|---|---|
| 2801. | Definitions. |
| 2802. | Franchise relationship. |
| 2803. | Trial and interim franchises. |
| 2804. | Notification of termination or nonrenewal of franchise relationship. |
| 2805. | Enforcement provisions. |
| 2806. | Relationship of statutory provisions to State and local laws. |

SUBCHAPTER II—OCTANE DISCLOSURE

| 2821. | Definitions. |
| 2822. | Automotive fuel rating testing and disclosure requirements. |
| 2823. | Administration and enforcement provisions. |
| 2824. | Relationship of statutory provisions to State and local laws. |

SUBCHAPTER III—SUBSIDIZATION OF MOTOR FUEL MARKETING

| 2841. | Study by Secretary of Energy. |

### SUBCHAPTER I—FRANCHISE PROTECTION

## § 2801. Definitions

As used in this subchapter:

(1)(A) The term "franchise" means any contract—

(i) between a refiner and a distributor,

§ 2801    TITLE 15—COMMERCE AND TRADE    Page 1052

(ii) between a refiner and a retailer,

(iii) between a distributor and another distributor, or

(iv) between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

(B) The term "franchise" includes—

(i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

(ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed—

(I) under a trademark owned or controlled by a refiner; or

(II) under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and

(iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

(2) The term "franchise relationship" means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

(3) The term "franchisor" means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(4) The term "franchisee" means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(5) The term "refiner" means any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person.

(6) The term "distributor" means any person, including any affiliate of such person, who—

(A) purchases motor fuel for sale, consignment, or distribution to another; or

(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier.

(7) The term "retailer" means any person who purchases motor fuel for sale to the general public for ultimate consumption.

(8) The term "marketing premises" means, in the case of any franchise, premises which, under such franchise, are to be employed by the franchisee in connection with sale, consignment, or distribution of motor fuel.

(9) The term "leased marketing premises" means marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

(10) The term "contract" means any oral or written agreement. For supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels.

(11) The term "trademark" means any trademark, trade name, service mark, or other identifying symbol or name.

(12) The term "motor fuel" means gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads, and highways.

(13) The term "failure" does not include—

(A) any failure which is only technical or unimportant to the franchise relationship;

(B) any failure for a cause beyond the reasonable control of the franchisee; or

(C) any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).

(14) The terms "fail to renew" and "nonrenewal" mean, with respect to any franchise relationship, a failure to reinstate, continue, or extend the franchise relationship—

(A) at the conclusion of the term, or on the expiration date, stated in the relevant franchise;

(B) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date; or

(C) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978, and has not been renewed after such date.

(15) The term "affiliate" means any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person.

(16) The term "relevant geographic market area" includes a State or a standard metropolitan statistical area as periodically established by the Office of Management and Budget.

(17) The term "termination" includes cancellation.

(18) The term "commerce" means any trade, traffic, transportation, exchange, or other commerce—

(A) between any State and any place outside of such State; or

(B) which affects any trade, transportation, exchange, or other commerce described in subparagraph (A).

2

(19) The term ''State'' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and any other commonwealth, territory, or possession of the United States.

(Pub. L. 95–297, title I, §101, June 19, 1978, 92 Stat. 322; Pub. L. 103–371, §6, Oct. 19, 1994, 108 Stat. 3486.)

### AMENDMENTS

1994—Par. (13)(C). Pub. L. 103–371 added subpar. (C).

### SHORT TITLE OF 1994 AMENDMENT

Section 1 of Pub. L. 103–371 provided that: ''This Act [amending this section and sections 2802, 2805, and 2806 of this title] may be cited as the 'Petroleum Marketing Practices Act Amendments of 1994'.''

### SHORT TITLE

Section 1 of Pub. L. 95–297 provided: ''That this Act [enacting this chapter and provisions set out as a note under section 2822 of this title] may be cited as the 'Petroleum Marketing Practices Act'.''

## §2802. Franchise relationship

### (a) General prohibition against termination or nonrenewal

Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

### (b) Precondition and grounds for termination or nonrenewal

(1) Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if—

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure—

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

(B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if—

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

(D) An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship, if—

(i) such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;

(ii) the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804(d) of this title; and

(iii) within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement.

(E) In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if—

(i) such determination—

(I) was made after the date such franchise was entered into or renewed, and

(II) was based upon the occurrence of changes in relevant facts and circumstances after such date;

(ii) the termination or nonrenewal is not for the purpose of converting the premises, which are the subject of the franchise, to operation by employees or agents of the franchisor for such franchisor's own account; and

Westlaw.

DC ST § 28:2-210                                                                                     Page 1

Formerly cited as DC ST 1981 § 28:2-210

**c**

District of Columbia Official Code 2001 Edition Currentness
  Division V. Local Business Affairs
    Title 28. Commercial Instruments and Transactions. (Refs & Annos)
      Subtitle I. Uniform Commercial Code. (Refs & Annos)
        Article 2. Sales.
          Part 2. Form, Formation and Readjustment of Contract.
          → § 28:2-210. Delegation of performance; assignment of rights.

(1) A party may perform his duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract. No delegation of performance relieves the party delegating of any duty to perform or any liability for breach.

(2) Except as otherwise provided in section 28:9-406, unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance. A right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise.

(2A) The creation, attachment, perfection, or enforcement of a security interest in the seller's interest under a contract is not a transfer that materially changes the duty of or increases materially the burden or risk imposed on the buyer or impairs materially the buyer's chance of obtaining return performance within the purview of subsection (2) unless, and then only to the extent that, enforcement actually results in a delegation of material performance of the seller. Even in that event, the creation, attachment, perfection, and enforcement of the security interest remain effective, but (a) the seller is liable to the buyer for damages caused by the delegation to the extent that the damages could not reasonably be prevented by the buyer; and (b) a court having jurisdiction may grant other appropriate relief, including cancellation of the contract for sale or an injunction against enforcement of the security interest or consummation of the enforcement.

(3) Unless the circumstances indicate the contrary a prohibition of assignment of "the contract" is to be construed as barring only the delegation to the assignee of the assignor's performance.

(4) An assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of rights and unless the language or the circumstances (as in an assignment for security) indicate the contrary, it is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by him to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract.

(5) The other party may treat any assignment which delegates performance as creating reasonable grounds for insecurity and may without prejudice to his rights against the assignor demand assurances from the assignee (section 28:2-609).

CREDIT(S)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

DC ST § 28:2-210

Page 2

Formerly cited as DC ST 1981 § 28:2-210

(Dec. 30, 1963, 77 Stat. 644, Pub. L. 88-243, § 1; <u>Oct. 26, 2000, D.C. Law 13-201, § 201(c)(2), 47 DCR 7576</u>; <u>Apr. 13, 2005, D.C. Law 15-354, § 39(b), 52 DCR 2638</u>.)

Current through May 10, 2011

Copyright (C) 2011 By the District of Columbia. All Rights Reserved.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.