RECORD NO. 10-7168

# In The
# United States Court Of Appeals
# For The D.C. Circuit

## METROIL, INC,

*Plaintiff - Appellant,*

v.

## EXXONMOBIL OIL CORPORATION;
## EXXONMOBIL CORPORATION;
## ANACOSTIA REALTY, LLC,

*Defendants - Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

## CORRECTED BRIEF OF APPELLEE ANACOSTIA REALTY, LLC

**Alphonse M. Alfano**
**Bassman, Mitchell & Alfano, Chtd.**
**1707 L Street, N.W., Suite 560**
**Washington, D.C.  20036**
**(202) 466-6502, aalfano@bmalaw.net**

*Counsel for Appellee, Anacostia Realty, LLC*

## UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

METROIL, INC.                          )
                                       )
        Appellant,          )
                                       )
v.                                     )    Case No. 10-7168
                                       )    September Term 2010
EXXONMOBIL OIL CORP., et al.,          )
                                       )
        Appellees.         )
_____

## CERTIFICATE OF APPELLEE ANACOSTIA REALTY, LLC
## AS TO PARTIES, RULINGS, AND RELATED
## CASES PURSUANT TO CIRCUIT RULES 27(A)(4) AND 28(a)(1)

Pursuant to the Court's Order filed on December 10, 2010 and Circuit Rules 27(A)(4) and 28(a)(1), appellee Anacostia Realty, LLC hereby states as follows:

    (A)   <u>Parties and Amici</u>.

This certificate incorporates by reference the appellant's certificate of parties and amici set forth in the appellant's opening brief filed with the Court via CM/ECF on June 15, 2011.

Appellee's Disclosure Statement required by FRAP Rule 26.1 and Circuit Court Rule 26.1 was filed with the Court on or about December 28, 2010 via CM/ECF, document number 1285089.

    (B)   <u>Rulings Under Review</u>.   This certificate incorporates by reference the appellant's certificate of rulings under review set forth in the appellant's opening brief filed with the Court via CM/ECF on June 15, 2011.

(C)    <u>Related Cases</u>.  This certificate incorporates by reference the appellant's certificate of related cases set forth in the appellant's opening brief filed with the Court via CM/ECF on June 15, 2011.

Respectfully submitted,

_____/s/ Alphonse M. Alfano_____
Alphonse M. Alfano
BASSMAN, MITCHELL & ALFANO, CHARTERED
1707 L Street, N.W., Suite 560
Washington, D.C. 20036
Tel:  (202) 466-6502
Fax:  (202) 331-7510
Email:  bma@bmalaw.net

Attorneys for Appellee Anacostia Realty, LLC

# TABLE OF CONTENTS

TABLE OF CASES, STATUTES AND OTHER AUTHORITIES ........................v

GLOSSARY OF ABBREVIATIONS ........................................................x

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................1

STATEMENT OF THE CASE...........................................................2

STATEMENT OF THE FACTS .........................................................6

SUMMARY OF THE ARGUMENT ........................................................8

    1.    Summary Of RSSAA Argument ................................................8

    2.    Summary Of Conspiracy Argument.....................................8

    3.    Summary Of Nonrenewal Argument ..................................9

    4.    Summary Of Breach Of Contract Argument .....................10

ARGUMENT .......................................................................10

    A.    The District Court Properly Dismissed Appellant's Claim
           Under The RSSAA...........................................................10

    B.    The District Court Properly Dismissed Appellant's
           Civil Conspiracy Claim For Failure To State A Claim
           Upon Which Relief Can Be Granted...................................11

         1.    Even If There Was A Violation Of The RSSAA,
              A Civil Conspiracy Claim Will Not Lie In The
              Absence Of An Underlying Tortious Act .................................12

         2.    The Complaint Did Not Allege A Conspiracy
              To Commit A Tort....................................................15

3.  Statutory Violations Cannot Serve As A Predicate
    For Civil Conspiracy Claims Under The
    District Of Columbia Law..........................................................18

C.  Metroil Failed To Allege The Requisite Elements Of A
    Claim Under The PMPA For Unlawful Nonrenewal Of
    Its Franchise And The Claim Was Properly Dismissed.....................23

1.  The "Franchise Relationship," As Defined In The
    PMPA, Continues To Exist After The Expiration
    Of A Franchise Until It Is Nonrenewed. ....................................24

2.  Nonrenewal Of Franchise Relationship Occurs Only
    When One Or More Of The Three Essential Components
    Of A PMPA Franchise Has Been Discontinued.........................27

D.  The District Court Did Not Err In Dismissing
    Metroil's Breach Of Contract Claim ....................................30

CONCLUSION ...................................................................................30

CERTIFICATE OF COMPLIANCE......................................................32

CERTIFICATE OF SERVICE .............................................................33

ADDENDUM OF STATUTES ............................................................34

iv

## TABLE OF CASES, STATUTES AND OTHER AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abrams Shell v. Shell Oil Co.*
    343 F.3d 482, 488 (5th Cir. 2003)............................................................ 27, 28

*Ackley et al. v. Gulf Oil Corp., et al.*
    726 F.Supp. 353, 361 (D.Conn. 1989) ...........................................................27

*April Marketing & Distributing. Corp., Inc. v. Diamond Shamrock*
    *Refining and Marketing Co.*
    103 F.3d 28, 30 n. 3 (5th Cir. 1997) ...............................................................27

*Barnes v. Gulf Oil Corp.*
    795 F.2d 358, 360 (4th Cir. 1986).....................................................................27

*Bennett v. Kiggins*
    377 A.2d 57 (D.C. 1977) ..................................................................................16

*C.K. Smith & Co., Inc. v. Motiva Enterprises, LLC*
    126 F. Supp.2d 34, 37 (D. Mass. 2000) ..........................................................26

*Cedar Brook Service Station, Inc. v. Chevron U.S.A., Inc.*
    746 F.Supp. 268 (E.D.N.Y. 1989);
    *vac'd* 746 F.Supp. 278 (E.D.N.Y. 1990)
    aff'd 930 F.2d 908 (2nd Cir. 1991)
    *cert. denied* 112 S.Ct. 77 (1991) ....................................................................30

*Cinco J, Inc. v. Boeder*
    920 F.2d 296, 299 (5th Cir. 1991).....................................................................30

*Davis v. Gulf Oil Corporation*
    485 A.2d 160, 167 (D.C. 1984) ........................................................................28

Authorities upon which we chiefly rely are marked with asterisks (*).

v

*Delahanty v. Hinckley*
    845 F.2d 1069, 1071 (D.C. Cir. 1988)..........................................................19

*Dersch Energies, Inc. v. Shell Oil Company*
    314 F.2d 846, 860 (7th Cir. 2002)...................................................................27

*Douglas v. Lyles*
    841 A.2d 1, 5 at n.5 (D.C. 2004) ....................................................................19

*DuFresne's Auto Service, Inc. v. Shell Oil Co.*
    992 F.2d 920, 926 n.4 (9th Cir. 1993)............................................................26

*Elliott v. Healthcare Corp.*
    629 A.2d 6, 9 (D.C. 1993) ..............................................................................13

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp*
    749 A.2d 724, 738, 739 (D.C. 2000) ................................................. 14, 21, 22

*Griva v. Davison*
    637 A.2d 830, 848 (D.C. 1994) ......................................................................14

*Halberstam v. Welch*
    705 F.2d 472, 479 (D.C. Cir. 1983) ................................................. 13, 14, 21

*Halder v. Standard Oil Co.*
    642 F.2d 107, 111 (5th Cir. 1981)............................................... 26, 28, 29, 30

*Hall v. Clinton*
    143 F.Supp.2d 1, 7 (D.D.C. 2001)...................................................................18

*Han v. Mobil Oil Corp.*
    73 F.3d 872, 876 (9th Cir. 1995) ....................................................................27

*Hayduk v. Lanna*
    775 F.2d 441, 443 (1st Cir. 1985) ..................................................................16

*Hill v. Medlantic Health Care Group, et al.*
    933 A.2d 314, 334 (D.C. 2007) ......................................................................13

*Hogan v. Md. State Dental Ass'n*
    843 A.2d 902, 908 (Md. 2004), [FN6] ........................................................16

*In re C.A.P.*
    633 A.2d 787, 790 (D.C. 1993) ...................................................................19

*In re Spectrum, Ltd.*
    2007 WL 2320587 at *2 (Bankr.D.D.C. Aug. 9, 2007) ...............................16

*Kapiloff v. Abington Plaza Corp.*
    59 A.2d 516, 517 (D.C. 1948) ....................................................................16

*Lamont v. Haig*
    590 F.2d 1124, 1136 n. 73 (D.D.Cir.1978) ...................................................12

*Loughlin v. United States*
    230 F.Supp.2d 26, 50 (D.D.C. 2002).............................................................16

*\*Mac's Shell Serv., Inc. v. Shell Oil Products Co. LLC*
    130 S.Ct. 1251, 176 L.Ed.2d 36 (2010).........................................................4

*Manikhi v. Mass Transit Admin.*
    360 Md. 333, 360 at n.6, 758 A.2d 95, 110 (2000) ........................................15

*Mazloum v. District of Columbia*
    422 F.Supp.2d 1, 11 (D.D.C. 2006)....................................................... 14, 22

*\*Metroil, Inc. v. ExxonMobil Oil Corp., et al.*
    724 F.Supp.2d 70, 76 (D.D.C. 2010)........................................................7, 24

*Nader v. Democratic Nat'l Comm.*
    567 F.3d 692, 697 (D.C. Cir. 2009).............................................................14

*Newby v. United States*
    797 A.2d 1233, 1243 at n. 13 (D.C. 2002) ...................................................19

*NRT Mid-Atlantic v. Innovative Properties, Inc.*
    144 Md. App. 263 287, 797 A.2d 824, 838 (2002) ........................................15

*Park v. Sandwich Chef, Inc.*
   651 A.2d 798, 801-802 n 3 (D.C. 1994)......................................................16

*Patton Boggs, LLP v. Chevron Corp.*
   Civ.Action No. 10-01975 (HHK)
   2011 WL 147866 at *4 (D.D.C. April 19, 2011) ..........................................14

*Paul v. Howard Univ.*
   754 A.2d 297, 310 n. 27 (D.C. 2000) ...........................................................13

*Riddell v. Riddell Washington Corp.*
   866 F.2d 1480, 1494 (D.D.C.1989) ...............................................................18

*Robb v. Wancowicz*
   119 Md. App. 531, 705 A.2d. 125 (1998)......................................................19

*Schiff v. AARP*
   697 A.2d 1193, 1198 (D.C. 1997) .................................................................16

*Shukla v. BP Exploration & Oil, Inc.*
   115 F.3d 849, 854 (11th Cir. 1997) ...............................................................27

*Solid Rock Church, Disciples of Christ v. Friendship Public Charter School*
   925 A.2d 554, 561 (D.C. 2007) ....................................................................19

*Sturdza v. United Arab Emerates, et al.*
   281 F.3d 1287, 1306, (D.C. Cir. 2002)..........................................................16

\*Urban Develop. Solutions, LLC v. District of Columbia*
   992 A.2d 1255, 1269 (D.C. 2010) .................................................................14

*Waldon v Covington*
   415 A.2d 1070, 1074 n. 14 (D.C.1980)..........................................................12

*Weishapl v. Sowers*
   771 A.2d 1014, 1023 (D.C. 2001) .................................................... 13, 14, 15

*Wiggins v. Hitchens*
   853 F.Supp. 505, 513 (D.D.C. 1994)................................................... 20, 21

*Wiggins v. Philip Morris, Inc.*
 853 F.Supp. 470 (D.D.C. 1994)....................................................................20

*Youming Jin v. Ministry of State Security*
 335 F. Supp.2d 72, 79 n. 2 (D.D.C.2004)........................................ 13, 14, 15

## **Statutes**

15 U.S.C. § 1681 *et seq*...............................................................................20

15 U.S.C. § 2801, *et seq*................................................................................2

15 U.S.C. § 2801(1)(A)............................................................................ 24, 26

15 U.S.C. § 2801(1)(B)(i) ..............................................................................25

15 U.S.C. § 2801(2) ...................................................................................9, 25

15 U.S.C. § 2801(10).....................................................................................26

15 U.S.C. § 2802............................................................................................23

15 U.S.C. §2802(b)(1) ...................................................................................26

15 U.S.C. § 2804............................................................................................23

D.C. Code § 36-304.11 ....................................................................................6

D.C. Code § 36-304.12(a).................................................................................7

## **Other Authorities**

S.Rep. No.731, 95th Cong., 2nd Sess. 30
 *reprinted* in 1978 U.S.C.C.A.N. 873, 888) ....................................................26

## **Rules**

Rule 9(b) of the Federal Rules of Civil Procedure ....................................................15

# GLOSSARY OF ABBREVIATIONS

"Anacostia":                  the appellee, Anacostia Realty, LLC

"Ann.":                       annotated

"App.":                       Appendix

"App. Brief":                 Appellant's opening brief

"Cmplt.":                     Appellant's complaint

"ExxonMobil":                 collectively, the appellees ExxonMobil Corporation and ExxonMobil Oil Corporation

"Metroil":                    the appellant, Metroil, Inc.

Metroil Brief:                Brief of Appellant, Metroil

"Op.":                        opinion

Plt. Opp. to Exxon Mot. to Dismiss:     Metroil's Memorandum in Opposition to Exxon Defendants' Motion to Dismiss and Request for Hearing

Plt. Opp. to Anacostia Mot. to Dismiss:     Metroil's Memorandum in Opposition to Anacostia's Motion to Dismiss or, in the Alternative, for Summary Judgment and Request for Hearing

"PMPA":                       Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.*

"RSSAA":                      District of Columbia Retail Service Station Amendment Act of 2009

"U.S.C.":                     United States Code

## STATEMENT OF JURISDICTION

This Statement of Jurisdiction incorporates by reference the appellant's statement of jurisdiction set forth in the appellant's opening brief filed with the Court via CM/ECF on June 15, 2011.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the district court properly refused to apply the District of Columbia's Retail Service Station Amendment Act ("RSSAA") to a transaction occurring before its effective date where the statute contains no express legislative language or other clear implication that a retroactive application was intended.

2.      Whether the district court properly dismissed Metroil's civil conspiracy claim where the object of the alleged conspiracy is a violation of the RSSAA, and where Metroil's RSSAA claim was properly dismissed for failure to state a claim upon which relief can be granted.

3.      Whether the civil conspiracy claim was otherwise dismissible because Metroil failed to allege an overt tortious act in furtherance of the conspiracy.

4.      Whether the district court properly dismissed Metroil's claim for unlawful nonrenewal of its franchise relationship with Anacostia under the PMPA where Metroil failed to allege a discontinuation of any essential element of the franchise.

5.      Whether the district court properly dismissed Metroil's breach of contract claim on the ground that the assignment of the franchise agreement from ExxonMobil to Anacostia, and the changes implemented by Anacostia on a post-assignment basis, were expressly permitted by the franchise agreement.

1

## STATEMENT OF THE CASE

This case was instituted by Metroil, Inc. ("Metroil") against ExxonMobil Oil Corporation and ExxonMobil Corporation (collectively "ExxonMobil") and Anacostia Realty, LLC ("Anacostia").  App. at 9-23.

Metroil operates a retail gasoline service station in the District of Columbia (the "Station") where it sells Exxon-branded motor fuel products to the general motoring public.  App. at 11.

ExxonMobil is an integrated refiner, marketer and distributor of petroleum products that markets motor fuel products under the Mobil and Exxon brands. App. at 10, 11, 28.  ExxonMobil's branded products are sold at retail service stations operated by dealers, like Metroil.  *Id.*  ExxonMobil also owns and leases service stations to dealers, like Metroil.  App. at 11, 163.  ExxonMobil's relationship with such dealers is governed by the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §2801, *et seq*.  App. at 19, 20, 167.

Anacostia is a wholesale distributor of Exxon-branded motor fuels. Anacostia purchases Exxon-branded motor fuels from ExxonMobil and resells the products to independent dealers.  App. at 14, 15, 16, 26, 269-70.

ExxonMobil sold a number of retail service stations in the Washington, D.C. metropolitan area to Anacostia pursuant to a written contract executed by the parties in December, 2008.  App. at 14, 32, 62-63.  Anacostia purchased the

Station and the Metroil franchise pursuant to the contract. *Id.* This action arises out of ExxonMobil's sale of the Station and the assignment of the Metroil franchise to Anacostia.

On September 29, 2009, Metroil filed its complaint in the United States District Court for the District of Columbia. App. at 1. The complaint sets forth five counts. App. 17-22. Only Counts II and IV are directed at Anacostia. Metroil seeks an aggregate damage in an amount in excess of $500,000 and punitive damages plus injunctive relief. *Id.*

In Count I, the complaint alleges that ExxonMobil's sale of the Station violated the District of Columbia Retail Service Station Amendment Act of 2009 (the "RSSAA") because ExxonMobil failed to offer to sell the Station to Metroil prior to the sale to Anacostia. App. at 17. The complaint alleges, in substance, that Metroil was entitled to a right of first refusal under the RSSAA because the sale of the Station took place after the April 1, 2009 safe harbor date contained in the RSSAA. App. at 17.

Count II of the complaint is a civil conspiracy claim. App. at 17. In Count II, Metroil alleges that ExxonMobil conspired with Anacostia to violate the RSSAA by entering an agreement with Anacostia to sell the Station without providing Metroil a right of first refusal. App. at 17-18.

Count III is a claim against ExxonMobil for the constructive termination of the Metroil franchise in violation of the PMPA.  App. at 18-20.  Metroil abandoned its Count III claim in view of the recent decision of the United States Supreme Court in *Mac's Shell Serv., Inc. v. Shell Oil Products Co. LLC*, 130 S.Ct. 1251, 176 L.Ed.2d 36 (2010).  Metroil Brief at 3 n. 1.

Count IV is a claim for wrongful nonrenewal of the franchise in violation of the PMPA.  App. at 20.  In Count IV, Metroil alleges that both ExxonMobil and Anacostia violated the PMPA by failing to renew the franchise relationship with Metroil when the franchise expired on June 30, 2009.  App. at 20-21.

Count V is a claim for breach of contract against ExxonMobil.  App. at 21. Metroil alleges in Count V that the assignment of the franchise to Anacostia constitutes a breach of the franchise agreement.  App. at 21-22.

On November 20, 2009, ExxonMobil and Anacostia each filed motions to dismiss for failure to state a claim on which relief can be granted or, in the alternative, for summary judgment.  App. at 24, 163.   Metroil filed an opposition to both motions on December 18, 2009.  App. at 224, 258.  Anacostia filed a reply to Metroil's opposition on February 1, 2010.  App. at 384.  ExxonMobil' reply was filed on January 29, 2010.  On July 20, 2010, the trial court granted both motions and dismissed all claims against ExxonMobil and Anacostia.  App. at 465.

In dismissing Count I, the court found that the RSSAA contained no express retroactivity language and, therefore, did not apply retroactively to the sale of the Station and franchise.   App. at 473.   Because the allegation of ExxonMobil's violation of the RSSAA served as the basis for the civil conspiracy claim, Count II was dismissed for failure to state a claim.  App. at 473.

In dismissing Metroil's claim at Count IV for wrongful nonrenewal of franchise relationship under the PMPA, the court found that Metroil did not allege that its right to use the ExxonMobil trademark, its access to Exxon-branded motor fuel, or its occupancy of the Station were interrupted.  App. at 477.   Accordingly, the court found that Metroil failed to state a claim for wrongful nonrenewal of the franchise relationship under the PMPA.  *Id.*

The court found no basis for the breach of contract claim alleged against ExxonMobil in Count V.  App. at 477-480.  The court held, as a matter of law, that Metroil could not challenge the assignment of the franchise to Anacostia because the assignment and the actions that purportedly breached the contract were permitted by the franchise agreement.  App. at 480.

On July 28, 2010, Metroil filed a motion to alter or amend judgment to reinstate Metroil's RSSAA and civil conspiracy claims.  App. at 481.  Metroil contended that it was the intent of the District of Columbia Council that the RSSAA be applied retroactively based on an unenacted resolution of the City

Council that purportedly made the Council's intent clear.  App. at 481.  Anacostia and ExxonMobil both opposed the motion. App. at 506, 511.  The court denied Metroil's motion on October 25, 2010.  App. at 518.

Metroil noted an appeal on November 18, 2010. App. at 522.

## STATEMENT OF THE FACTS

The Retail Service Station Amendment Act of 2009, Law 18-35, was introduced in the D.C. City Council and assigned Bill No. 18-88, and it was referred to the Committee of the Whole.  D.C. Code § 36-304.11 (see Historical and Statutory Notes).  The Bill was adopted on first and second readings on April 21, 2009, and May 5, 2009, respectively.  *Id.*  It was signed by the Mayor on May 21, 2009, and it was assigned Act No. 18-86 and transmitted to both Houses of Congress and became effective on July 18, 2009.  Metroil concedes that the RSSAA became effective on July 18, 2009.  See App. at 13, Cmplt. at ¶14.

The Act affords dealers an option to purchase service station premises in the event the franchisor decides to sell, transfer or assign its interests in the premises:

> (a) In the case of leased marketing premises as to which the franchisor owns a fee interest, the franchisor shall not sell, transfer, or assign to another person the franchisor's interest in the premises unless the franchisor has first either made a bona fide offer to sell, transfer, or assign to the franchisee the franchisor's interest in the premises, other than signs displaying the franchisor's insignia and any other trademarked, servicemarked, copyrighted, or patented items of the franchisor, or, if applicable, offered to the franchisee a right of first refusal of any bona fide offer acceptable to the franchisor made by

6

> another person to purchase the franchisor's interest in the premises.  A franchisee shall have 60 days in which to accept or reject a bona fide offer.

D.C. Code § 36-304.12(a).

The option to purchase, or right of first refusal, as the case may be, is triggered by the sale, transfer or assignment of the relevant property.

On June 16, 2009, ExxonMobil sold Metroil's Station to Anacostia, along with a number of other service station properties located in the District of Columbia.  Metroil Brief at 5, 8, 11; App. at 14, Cmplt. at ¶19; App. at 243, Plt. Opp. to Exxon Mot. to Dismiss at 16; and App. at 266, Plt. Opp. to Anacostia Mot. to Dismiss at 4.  Metroil concedes that the sale of the Station occurred prior to the effective date of the RSSAA.  Metroil Brief at 5, 8, 11; App. at 230-239, Plt. Opp. to Exxon Mot. to Dismiss at 3-12; App. at 268-271, Plt. Opp. to Anacostia Mot. to Dismiss at 6-9; *See, also* App. at 470 (*Metroil, Inc. v. ExxonMobil Oil Corp., et al.*, 724 F.Supp.2d 70, 76 (D.D.C. 2010)).

Contemporaneous with the sale of the properties, ExxonMobil assigned the franchise agreements, including its franchise agreement with Metroil, to Anacostia.  App. at 14-16, Cmplt. at ¶¶19, 22, 26, and 34; App. at 243, Plt. Opp. to Exxon Mot. to Dismiss at 16; and App. at 269-270, Plt. Opp. to Anacostia Mot. to Dismiss at 7-8.

Metroil does not allege in its complaint that the assignment of the franchise to Anacostia resulted in an interruption of its use of the Exxon trademark, the supply of the Exxon-branded motor fuels, or the occupancy of the Station.

## SUMMARY OF THE ARGUMENT

### 1.     Summary Of RSSAA Argument

There is no dispute that the transaction at issue in this case, the sale by ExxonMobil to Anacostia of the service station occupied by Metroil, occurred before the effective date of the RSSAA.  The RSSAA does not apply retroactively to this transaction because the statute contains no express legislative language or other clear implication that a retroactive application was intended.  Anacostia adopts and incorporates by reference the arguments made by Appellee ExxonMobil on this issue.

### 2.     Summary Of Conspiracy Argument

The district court properly dismissed Metroil's civil conspiracy claim because the object of the alleged conspiracy is a violation of the RSSAA which does not apply retroactively to cover the transaction at issue.  Even if the district court found that ExxonMobil violated the RSSAA, a statutory violation, such as a violation of the RSSAA, cannot serve as the basis of a civil conspiracy claim under District of Columbia law.  Civil conspiracy cannot be asserted as an independent claim standing on its own; it is a means of establishing vicarious liability for an

underlying tort. The elements of civil conspiracy are an agreement to take part in an unlawful action or lawful action in an unlawful manner, and an overt tortious act in furtherance of the agreement that causes injury. The complaint in this action does not allege a conspiracy to commit a tort. It is based entirely on an alleged violation of the RSSAA, and a statutory violation, standing alone, cannot support a civil conspiracy claim.

### 3.     Summary Of Nonrenewal Argument

The district court properly dismissed Metroil's claim for unlawful nonrenewal of its franchise relationship with Anacostia under the PMPA. The PMPA explicitly distinguishes between a "franchise" and a "franchise relationship." Under the PMPA, a "franchise" is an oral or written agreement between the franchisor and franchisee for the supply of motor fuels under a refiner trademark and the lease for the service station at which such motor fuels are sold. The term "franchise relationship" refers to "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuels under a franchise." 15 U.S.C. § 2801(2). The franchise relationship continues to exist after a "franchise" expires by its term until it is nonrenewed, and no such nonrenewal can occur as long as the three essential components of a petroleum franchise remain intact. The three elements of a franchise are: (i) a contract to use the refiner's trademark, (ii) a contract for the

supply of motor fuels to be sold under the trademark, and (iii) a lease of the premises at which the motor fuel is sold.  The complaint in the instant case does not allege the discontinuation of any of these three elements.  The district court properly concluded that no legally sufficient claim for nonrenewal of the franchise relationship can be made in the absence of allegations that at least one of the essential elements has been discontinued.

### 4.      Summary Of Breach Of Contract Argument

The district court properly dismissed Metroil's breach of contract claim which alleged that ExxonMobil's assignment of the franchise to Anacostia breached the franchise agreement.  The court correctly concluded that the assignment, and the changes implemented by Anacostia on a post-assignment basis, were expressly authorized by the franchise agreement.  The breach of contract claim is asserted only against ExxonMobil.  Anacostia hereby adopts and expressly incorporates by reference the arguments set forth by Appellee ExxonMobil on this issue.

### ARGUMENT

### A.      The District Court Properly Dismissed Appellant's Claim Under The RSSAA

The district court properly dismissed Appellant's RSSAA claim in Count I of the Complaint for the reasons set forth in the memorandum opinions accompanying its orders dismissing Count I for failure to state a claim upon which

relief can be granted, App. at 465-483, and denying Appellant's motion to alter or amend the judgment.  App. at 518-521.  Count I was asserted only against ExxonMobil.  Appellee Anacostia hereby incorporates by reference the arguments set forth in the brief of Appellee ExxonMobil in support of the district court's dismissal of the RSSAA claim.

### B.  The District Court Properly Dismissed Appellant's Civil Conspiracy Claim For Failure To State A Claim Upon Which Relief Can Be Granted

In Count II of the Complaint, Metroil asserted its first claim against Anacostia.  It alleged that "[d]efendants entered into an agreement to violate the Act and to conceal their violation of the Act, and performed overt acts pursuant to and in furtherance of their common scheme . . ."  App. at 8, Cmplt at ¶31.

According to the complaint, the acts undertaken by Anacostia and ExxonMobil in furtherance of the conspiracy were:  (i) entering into an illegal sale and conveyance of the Station; (ii) entering into a "confidentiality agreement" in an attempt to conceal their purported violation of the Act; and (iii) misrepresenting and concealing from plaintiff "the true nature and substance of their illegal transaction." *Id.*

The district court dismissed the civil conspiracy claim on the ground that Metroil did not establish an underlying unlawful act.  App. at 473, *Metroil v. ExxonMobil Oil Corp., et al.*, 724 F.Supp.2d 70, 78 (D.D.C. 2010).  The court

11

found that the RSSAA contains no express retroactivity language and, therefore, that ExxonMobil did not violate the RSSAA: "[B]ecause the plaintiff's civil conspiracy claims in Count II are based entirely on the defendants' alleged violations of the RSSAA, the court also dismisses Count II for failure to state a claim."   *Id.*   Accordingly, the court never reached the question of whether Metroil's conspiracy claim was properly pled.

For the reasons stated in its opinions, and for the reasons stated by ExxonMobil in its accompanying brief, the district court properly concluded that no violation of the RSSAA occurred.  However, even if the trial court had found that ExxonMobil violated the RSSAA, a statutory violation, such as the violation of the RSSAA, cannot serve as the basis of a civil conspiracy claim under District of Columbia law.

> 1.   Even If There Was A Violation Of The RSSAA, A Civil Conspiracy Claim Will Not Lie In The Absence Of An <u>Underlying Tortious Act.</u>

Civil conspiracy is not a separate or independent tort capable of standing on its own as a cause of action.  Rather it is a means for establishing vicarious liability for an underlying tort:

> "there is no recognized *independent* tort action for civil conspiracy in the District of Columbia."  *See Waldon v Covington*, 415 A.2d 1070, 1074 n. 14 (D.C.1980) (emphasis added) (citing *Lamont v. Haig*, 590 F.2d 1124, 1136 n. 73 (D.D.Cir.1978).  Since liability for civil conspiracy depends on performance of some underlying tortious act, the

conspiracy is not independently actionable; rather it is a means for establishing vicarious liability for the underlying tort.

*Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983).[1]

The *Halberstam* court defined the elements of a civil conspiracy claim as "an agreement to take part in an unlawful action or lawful action in an unlawful manner, and an overt *tortious* act in furtherance of the agreement that causes injury." *Id.* (emphasis added).   In setting forth these standards, the court emphasized the dependency of a civil conspiracy claim "on performance of some underlying tortious act," and it articulated the purpose of such a claim, which is to establish "vicarious liability for the underlying tort." *Id.*   This Court's conclusions in *Halberstam* are well-grounded in District of Columbia law.

------------------------

[1] *See also, e.g., Hill v. Medlantic Health Care Group, et al.*, 933 A.2d 314, 334 (D.C. 2007) ("Civil conspiracy 'is not an independent tort but only a means for establishing vicarious liability for an underlying tort.'"); *Youming Jin v. Ministry of State Security,* 335 F. Supp.2d 72, 79 n. 2 (D.D.C.2004) ("under District of Columbia law, a party seeking to recover for civil conspiracy must allege an underlying tortious act."), *Weishapl v. Sowers*, 771 A.2d 1014, 1023-24 (D.C. 2001) ("[C]ivil conspiracy depends on the performance of some underlying tortious act.  It is thus not an independent action; it is rather a means for establishing vicarious liability for an underlying tort."); *Paul v. Howard Univ.*, 754 A.2d 297, 310 n. 27 (D.C. 2000) ("conspiracy is not an independent tort but only 'a means for establishing vicarious liability for [an] underlying tort.'"); *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) ("civil conspiracy depends on the performance of some underlying tortious act. It is thus not an independent action; it is, rather, a means for establishing vicarious liability for the underlying tort"); *Elliott v. Healthcare Corp.*, 629 A.2d 6, 9 (D.C. 1993) ("there is no recognized *independent* tort action for civil conspiracy in the District of Columbia").

It is well-settled under District of Columbia law that a "[c]laim for civil conspiracy depends on the performance of some underlying tortious act." *Urban Develop. Solutions, LLC v. District of Columbia,* 992 A.2d 1255, 1269 (D.C. 2010); *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001) ("civil conspiracy depends on the performance of some underlying tortious act."); *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000)("[C]ivil conspiracy depends on performance of some underlying tortious act.") (citation omitted); *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) ("civil conspiracy depends on the performance of some underlying tortious act."). This precedent has been followed by this Court and the U.S. District Court for the District of Columbia.[2]

---

[2] *See, e.g.*, *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)(the elements of a civil conspiracy are "an agreement to take part in an unlawful action or a lawful action in an unlawful manner, ***and an overt tortious act*** in furtherance of the agreement that causes injury.") (citations omitted) (emphasis added); *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009) (citing D.C. law, the court held that a "claim for civil conspiracy . . . fails unless the elements of the underlying tort are satisfied . . . civil conspiracy depends on performance of some underlying tortious act.") (citations and internal quotations omitted); *Patton Boggs, LLP v. Chevron Corp.*, Civ.Action No. 10-01975 (HHK), 2011 WL 147866 at *4 (D.D.C. April 19, 2011) ("In the District of Columbia . . . a claim for civil conspiracy will not lie in the absence of an underlying tortious act") (citation omitted); *Youming Jin v. Ministry of State Security*, 335 F.Supp.2d 72, 79 n.2 (D.D.C. 2004) ("under District of Columbia law, a party seeking to recover for civil conspiracy must allege an underlying tortious act") (citation omitted); *Mazloum v. District of Columbia*, 422 F.Supp.2d 1, 11 (D.D.C. 2006) ("a common law civil conspiracy depends on the performance of some underlying tortious act.") (citations and internal quotations omitted).

Not only must there be an underlying tort, but the underlying tort must be pled against one of the conspiring parties. *Youming,* 335 F. Supp.2d at 79 n. 2, *citing Weishapl*, 771 A.2d at 1023-24 ("recovery for civil conspiracy must allege an underlying tortious act."). Indeed, the underlying tort must be set forth in a separate count in the complaint. *Manikhi v. Mass Transit Admin*., 360 Md. 333, 360 at n.6, 758 A.2d 95, 110 (2000); *NRT Mid-Atlantic v. Innovative Properties, Inc*., 144 Md. App. 263 287, 797 A.2d 824, 838 (2002).

In the instant case, Metroil did not properly plead any tortious conduct in furtherance of the alleged conspiracy.

## 2.    The Complaint Did Not Allege A Conspiracy To Commit A Tort.

The closest Metroil comes to asserting a tort is the allegation that Anacostia and ExxonMobil misrepresented and concealed from Metroil "the true nature and substance of their illegal transaction." App. at 18, Cmplt at ¶31. Misrepresentation and concealment can, of course, constitute actionable fraud, but the elements have not been pled anywhere in the complaint. Nor have they been pled with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

Rule 9(b) sets forth the pleading requirements for fraud or mistake:

(b)   Fraud or Mistake; Conditions of Mind.   In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.

15

A complaint alleging fraud must aver with particularity circumstances showing that the claim establishes each element of fraud. *Sturdza v. United Arab Emerates, et al*. 281 F.3d 1287, 1306, (D.C. Cir. 2002) ("In all averments of fraud…the circumstances constituting fraud…shall be stated with particularity.") and *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985) ("In actions alleging conspiracy to defraud or conceal, the particularity requirements of Rule 9(b) must be met."). *See also, Park v. Sandwich Chef, Inc*., 651 A.2d 798, 801-802 n 3 (D.C. 1994) ("A plaintiff alleging fraud 'must do so with particularity and must prove it by clear and convincing evidence.'")

The elements of common law fraud in the District of Columbia were stated in *Bennett v. Kiggins*, 377 A.2d 57 (D.C. 1977):

> In the District of Columbia, the elements of fraud are: (1) a false representation or willful omission in reference to a material fact, (2) made with knowledge of its falsity, and (3) with intent to induce the party to rely on the representation or omission, where (4) the party relies upon the representation or omission (5) to its detriment. *Schiff v. AARP*, 697 A.2d 1193, 1198 (D.C. 1997). It is well established under District of Columbia law that "**mere silence does not constitute fraud unless there is a duty to speak**." ***Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C. 1948)**; *see also In re Spectrum, Ltd.*, 2007 WL 2320587 at *2 (Bankr.D.D.C. Aug. 9, 2007) (collecting cases). Such a duty to speak can arise either from a fiduciary relationship, *see Hogan v. Md. State Dental Ass'n*, 843 A.2d 902, 908 (Md. 2004), [FN6] or from an instance where a material fact or defect is unobservable or undiscoverable by "an ordinarily prudent person upon reasonable inspection," *Loughlin v. United States*, 230 F.Supp.2d 26, 50 (D.D.C. 2002). Moreover, "fraud is never presumed" and a plaintiff must "allege such facts as will reveal the existence of all the requisite elements of fraud."

*Id.* at 59 (emphasis added).

To the extent the complaint relies on misrepresentation, it does not allege what, in particular, was represented, by whom, to whom, when, or how the representation was inaccurate. There is no reference to whether the unidentified representation constitutes one of material fact, or any facts to support a claim that the representation was made with an intent to deceive. Nor does the complaint recite any fact to establish Metroil's reliance on the representation.

Similarly, to the extent Metroil relied on a "willful omission," there are no facts to support the conclusion that either Anacostia or ExxonMobil had a duty to disclose to Metroil the transaction at issue (that is, prior to its consummation) or that Metroil relied to its detriment on any lack of knowledge that the transaction had occurred. Here, of course, Metroil was advised of the transaction a day or two after it occurred (see App. at 14, Cmplt at ¶21), and Metroil offered nothing to indicate that it would have been better off had it learned of the transaction a couple of days earlier. Nor were there any facts alleged to establish any intent to deceive, any reliance by Metroil, any fiduciary relationship between the parties, or any other facts establishing that the silence of either Anacostia or ExxonMobil constitutes actionable fraud.

In short, the recitation in the complaint (App. at 18, Cmplt at ¶31) could not have been any shorter or more non-descriptive. Nor could it have been more non-factual. The conclusory statement that ExxonMobil or Anacostia misrepresented

17

and concealed from Metroil and other interested parties "the true nature and substance of their illegal transaction" is not a fact at all. App. at 18, Cmplt at ¶31.

Notwithstanding the absence of a properly-pled claim of tortious conduct on the part of ExxonMobil or Anacostia, Metroil nevertheless maintains that Count II is valid, asserting a purported violation of the RSSAA as its predicate for the claim of civil conspiracy. Statutory violations, however, are not a substitute for tortious conduct and cannot support a civil conspiracy claim.

> 3.    Statutory Violations Cannot Serve As A Predicate For Civil Conspiracy Claims <u>Under The District Of Columbia Law</u>.

Metroil alleges a violation of the RSSAA by ExxonMobil, and it claims that Anacostia is vicariously liable for the violation under a civil conspiracy theory. Statutory violations alone, however, will not support a civil conspiracy claim under District of Columbia law. *Hall v. Clinton*, 143 F.Supp.2d 1, 7 (D.D.C. 2001). There must be some underlying tortious conduct in furtherance of the conspiracy.

In *Hall*, 143 F.Supp.2d 1, the plaintiff alleged a conspiracy to violate the Hatch Act by using government resources and personnel to create a database for use as a partisan tool. In dismissing the conspiracy count, the district court explained that

> "as a matter of substantive law, one cannot be liable for a conspiracy that does not have as its object an actionable wrong." *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1494 (D.D.C.1989). Thus, a violation of the Hatch Act, even if true, cannot be the basis of a privately actionable *tort*.

18

*Hall* , 143 F.Supp.2d at 6.

The law is the same in Maryland.[3]  *See, e.g., Robb v. Wancowicz*, 119 Md. App. 531, 705 A.2d. 125 (1998).  In *Robb*, the plaintiff was injured in a collision with an adult motorist.  The plaintiff brought an action against the motorist's father, who had affixed to the motorist's vehicle an expired license plate that had been issued for another vehicle.  The plaintiff sued for, among other things, civil conspiracy, contending that the motorist's father had entered into an agreement to violate a statute.  The trial court granted summary judgment in favor of the father and the plaintiff appealed.

Citing the Maryland Court of Appeals decision in *Domchick v. Greenbelt*, the Court of Special Appeals found that there could be no civil conspiracy to do something unless the act actually done constituted a tort.  *Robb*, 119 Md. App. at 546-47, 705 A.2d at 132.  In affirming the lower court decision, the Court of Special

---

[3] "Maryland authorities expounding the common law of that state constitute powerful precedent" in the District of Columbia.  *Newby v. United States*, 797 A.2d 1233, 1243 at n. 13 (D.C. 2002) (citation omitted).  Moreover, it is well-settled that "decisions of Maryland courts on questions of common law are authoritative in the absence of District authority."  *Solid Rock Church, Disciples of Christ v. Friendship Public Charter School*, 925 A.2d 554, 561 (D.C. 2007), *citing In re C.A.P.*, 633 A.2d 787, 790 (D.C. 1993); *Douglas v. Lyles*, 841 A.2d 1, 5 at n.5 (D.C. 2004)("a Maryland Court of Appeals decision expounding the common law of that state is an especially persuasive authority when the District's common law is silent")(citation omitted).   That is, the District of Columbia courts look to the laws of Maryland for guidance when a question novel to District of Columbia law is before the court.  *Delahanty v. Hinckley*, 845 F.2d 1069, 1071 (D.C. Cir. 1988).

Appeals stated that it found no evidence that the "purpose to be accomplished by the agreement was the perpetration of tortious conduct." *Id.*

In support of the contrary position, Metroil relies exclusively on two companion cases decided on the same day, by the same district judge, albeit in two separate opinions, *Wiggins v. Hitchens*, 853 F.Supp. 505, 513 (D.D.C. 1994) and *Wiggins v. Philip Morris, Inc.*, 853 F.Supp. 470 (D.D.C. 1994). These cases, however, do not stand for the proposition that statutory violations alone are sufficient to support a claim for civil conspiracy.

In *Wiggins*, the plaintiff alleged that the defendants agreed "to distribute a false consumer credit report regarding the [plaintiff] in order to terminate [the plaintiff] from his employment." *Wiggins,*853 F.Supp. at 513. The report falsely indicated that the plaintiff had been convicted of felony possession of cocaine. *Id.* at 509. The plaintiff alleged that the wrongful act violated the federal Fair Credit Reporting Act ("FRCA), 15 U.S.C. § 1681 *et seq.*, and that it constituted defamation and tortious interference with plaintiff's contract rights.

The plaintiff also alleged a civil conspiracy on the part of the defendant and others to interfere with contract rights, to defame the plaintiff, and to violate the FCRA. In analyzing the conspiracy claims, the district court acknowledged, citing *Halberstam*, that ". . . liability for civil conspiracy depends on performance of

20

some underlying tortious act . . . [and that it] establish[es] vicarious liability for the underlying tort." *Wiggins*, 853 F.Supp. at 513.

The district court correctly stated the elements of civil conspiracy, which include "an agreement to do an unlawful act . . . [and] an overt act in furtherance of the agreement by someone participating in it." *Wiggins*, 853 F.Supp. at 513. While it did not state explicitly, as *Halberstam* made clear, that the "overt act in furtherance of the agreement" must be a tortious act,[4] an understanding of this principle by the district court was implicit in its holding. In short, the district court found that parties can be vicariously liable under a civil conspiracy theory for agreeing to violate the FCRA, as long as the overt act in furtherance of the conspiracy (e.g., defamation or tortious interference with contract) is tortious. There is no indication in *Wiggins* that a claim for civil conspiracy can be based solely on an agreement to violate a statute.

In fact, six years after *Wiggins*, the District of Columbia Court of Appeals expressed skepticism that a civil conspiracy claim could lie for violation of a statute in the absence of a tortious act. In *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 739 (D.C. 2000), the court reiterated the well-settled rule that a "civil conspiracy depends on performance of some underlying tortious

---

[4] *Halberstam*, 705 F.2d at 479.

act."  In that case, the wrongful act supporting a civil conspiracy claim was the purported violation of the District of Columbia Human Rights Act ("DCHRA"). The trial court held that absent an underlying DCHRA claim, which had been dismissed for lack of standing, the plaintiff had no independent action to support the civil conspiracy claim.  *Id*. at 738.

In remanding the case on other grounds, the Court of Appeals cautioned the lower court to consider the authority which "suggests that a claim of civil conspiracy does not lie for violation of a statute such as the DCHRA." *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp*., 749 A.2d at 739 ("we note authority which suggests that a claim of civil conspiracy does not lie for violation of a statute such as the DCHRA").[5]

We are aware of no District of Columbia case that permitted a civil conspiracy claim to proceed on the basis of a statutory violation without an underlying tortious act in furtherance of the conspiracy.  Indeed, no court has attempted to interfere with the prerogatives of the legislature to define the scope

---

[5] The Court of Appeals went on to note that a New York court rejected a civil conspiracy claim based on a statute, like the DCHRA, because the statute "did not exist at common law, and therefore cannot give rise to tort liability."  *Id*. (citation omitted); *see, also Mazloum v. District of Columbia*, 442 F.Supp.2d 1, 9 n. 6 (D.D.C. 2006) (in finding no tortious act to support a civil conspiracy claim, the court noted the D.C. Court of Appeals' skepticism that a statutory violation could serve as the underlying wrongful act for a civil conspiracy claim)(citation omitted).

and reach of a statute by enlarging the category of persons who may sue for its violation.

The RSSAA provides an explicit remedy to an aggrieved plaintiff, limiting those who may be sued to persons who violate "any provision of this subchapter." [6] This Court should not expand the reach of the statute to non-violators by expanding the doctrine of civil conspiracy to cover non-tortious actions.

### C.    Metroil Failed To Allege The Requisite Elements Of A Claim Under The PMPA For Unlawful Nonrenewal Of Its Franchise And The Claim Was Properly Dismissed

In Count IV of the complaint, Metroil asserted its second claim against Anacostia.  App. at 20-21, Complt. at ¶¶36-39.  It alleged that "[t]he failure of Anacostia, following the purported assignment of Plaintiff's franchise, to renew said franchise or, alternatively, to provide Plaintiff timely notice of nonrenewal likewise constitutes wrongful violation of 15 U.S.C. §§ 2802 and 2804."  App. at 20, Cmplt. at ¶38.

———————————————

[6] Section 36-304.14 of the Act provides in relevant part:

**36-304.14.  Remedy for violation of subchapter**.

(a)  Any person who violates any provision of this subchapter may be sued in the Superior Court of the District of Columbia for temporary or permanent injunctive relief and damages, if any, and the costs of the suit.

In support of the wrongful nonrenewal claim, the complaint alleged that the franchise agreement expired by its own terms on August 1, 2009, and that Metroil was not offered a new written franchise agreement.  App. at 16, Cmplt. at ¶27. Nowhere in the complaint did Metroil allege an interruption of any of the three essential elements of the franchise, the right to use the Exxon trademark, access to the supply of Exxon-branded motor fuel, or the right to occupy the Station.  In dismissing Count IV, the district court found that a legally sufficient claim for nonrenewal under the PMPA cannot proceed in the absence of such allegations. App. at 476, *Metroil v. ExxonMobil Oil Corp., et al.*, 724 F.Supp.2d 70, 79 (D.D.C. 2010).

For the reasons that follow, the district court did not err in dismissing Count IV of the complaint.

> 1.    The "Franchise Relationship," As Defined In The PMPA, Continues To Exist After The Expiration Of A Franchise Until It Is Nonrenewed.

The term "franchise" means, among other things, any contract between a distributor or refiner, as the case may be, and a retailer, under which the retailer is authorized to use a trademark which is owned or controlled by a refiner in connection with the sale of motor fuel.  15 U.S.C. §2801(1)(A).  The lease for the Station and the

agreement to supply Exxon branded motor fuel, together, constitute a "franchise."[7]
App. at 11, 19, 20, Complt. at 7, 33, 37.  Prior to June 2009, ExxonMobil was the
"franchisor,"[8] and the plaintiff was the "franchisee."[9]  On June 16, 2009, the franchise
was assigned to Anacostia, and Anacostia became the franchisor.  App. at 14, 19, 63,
Complt. at 21, 34, Metroil Brief at 8, 10.

The PMPA explicitly distinguishes between a "franchise" and a "franchise
relationship."  The term "franchise relationship" refers to "the respective motor fuel
marketing or distribution obligations and responsibilities of a franchisor and a
franchisee which result from the marketing of motor fuel under a franchise."  15
U.S.C. § 2801(2).

The concept of a "franchise relationship" was created by Congress "to avoid
any contention that because the 'franchise' does not exist [after it expires] there is

---

[7] The term "franchise" includes the lease for the marketing premises employed in
connection with the sale, consignment, or distribution of motor fuel under the
trademark owned or controlled by the refiner of by a refiner which supplies the
motor fuel to the distributor which authorizes or permits occupancy of the
premises. 15 U.S.C. § 2801 (1)(B)(i).

[8] The term "franchisor" includes, among other things, a refiner or a distributor who
authorizes or permits under a franchise, a retailer to use a trademark in connection
with the sale of motor fuel 15 U.S.C. § 2801(3).

[9] The term "franchisee" includes a retailer who is authorized or permitted under a
franchise to use a trademark in connection with the sale of motor fuel.  15 U.S.C. §
2801(4).  A "retailer" means any person who purchases motor fuel for sale to the
general public for ultimate consumption.  *Id.* at § 2801(7).

nothing to renew," and to clarify that the PMPA "contemplates changes in the specific provisions of the franchise agreement at the time of renewal." *DuFresne's Auto Service, Inc. v. Shell Oil Co.*, 992 F.2d 920, 926 n.4 (9th Cir. 1993)(*quoting* S.Rep. No.731, 95th Cong., 2nd Sess. 30, *reprinted* in 1978 U.S.C.C.A.N. 873, 888). The very "dichotomy in the [PMPA] between 'franchise' and 'franchise relationship' recognizes the right of the franchisor to impose new terms after the expiration of the [franchise] but limits that right by a requirement that the franchisor must renew the 'relationship.'" *Halder v. Standard Oil Co.*, 642 F.2d 107, 111 (5th Cir. 1981).[10]

Thus, the franchisor is at liberty not to renew the existing franchise after the expiration date. *Id.* The franchisor is, however, required to continue the franchise relationship, which can continue under *any* franchise, even an open-ended or oral one. Under the PMPA, a "franchise" means a "contract," 15 U.S.C. § 2801(1)(A), which contract may be "oral or written." *Id.* at § 2801(10). It may also be of indefinite term. In short, a franchise relationship may continue, until it is nonrenewed, under any oral or written agreement, including an implicit understanding to continue, as before, under an expired written franchise agreement.

---

[10] *See also, C.K. Smith & Co., Inc. v. Motiva Enterprises, LLC*, 126 F. Supp.2d 34, 37 (D. Mass. 2000)(When a "franchise" expires, the "franchise relationship" continues, which the franchisor is obligated to renew unless the requirements of 15 U.S.C. §2802(b)(1) are met).

2.    Nonrenewal Of Franchise Relationship Occurs Only
When One Or More Of The Three Essential Components
<u>Of A PMPA Franchise Has Been Discontinued</u>.

Nonrenewal of a franchise relationship occurs only when "at least one of the three essential components of a petroleum franchise has been discontinued." *Abrams Shell v. Shell Oil Co*., 343 F.3d 482, 488 (5th Cir. 2003) (citation omitted); *Dersch Energies, Inc. v. Shell Oil Company*, 314 F.2d 846, 860 (7th Cir. 2002). The three elements of a franchise are "a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold." *Barnes v. Gulf Oil Cor*p., 795 F.2d 358, 360 (4th Cir. 1986). [11]

Where the plaintiff alleges that the defendant has failed to renew the franchise relationship, the plaintiff "must demonstrate that at least one of the three essential components of a petroleum franchise has been discontinued." *Dersch Energies v. Shell Oil Co*., 314 F.3d at 864-65; *Abrams Shell v. Shell Oil Company*, 343 F.3d 482,

---

[11] *Ackley et al. v. Gulf Oil Corp., et al*., 726 F.Supp. 353, 361 (D.Conn. 1989). *See, also Han v. Mobil Oil Corp*., 73 F.3d 872, 876 (9th Cir. 1995)(franchise is an agreement for the use of a trademark, lease of the service station and agreement to supply motor fuel under the trademark); *April Marketing & Distributing. Corp., Inc. v. Diamond Shamrock Refining and Marketing Co*., 103 F.3d 28, 30 n. 3 (5th Cir. 1997) (The three essential components of a petroleum franchise are (1) the right to occupy the leased premises; (2) the right to sell motor fuel under a trademark owned or controlled by a refiner; and (3) the right to be supplied with that fuel); *Shukla v. BP Exploration & Oil, Inc.,* 115 F.3d 849, 854 (11th Cir. 1997) (three elements of franchise  are use of trademark license, lease of real property or contract for supply of fuel).

488 (5th Cir. 2003) (citation omitted).  As the D.C. Court of Appeals stated in *Davis v. Gulf Oil Corporation*, 485 A.2d 160, 167 (D.C. 1984):

> regardless when the franchise agreement is scheduled to expire, it would defy the common meaning of the words to say that nonrenewal has taken effect as long as the franchisor willingly permits the franchisee to maintain possession of the premises and ***continues to supply the franchisee with gasoline pursuant to the agreement***.  (Emphasis added.)

*Halder v. Standard Oil Co*., 642 F.2d 107, 111 (5th Cir. 1981), is another case in point.  The franchisor, Chevron, the successor-in-interest of Standard Oil Co., received notice from the State of Georgia that the service station operated by Halder, the franchisee, was to be condemned.  The franchise consisted of a lease and motor fuel supply contract.  Chevron notified Halder that the franchise would be terminated on its stated expiration date but that Halder would be allowed to continue the franchise on a month to month basis.  Halder, fearing that he would receive no compensation from the State of Georgia for loss of business opportunity if Georgia proceeded to condemn the property, asked Chevron to renew the franchise so that he could share in the condemnation proceeds.  Chevron did not respond and Halder sued, asserting that Chevron "may not terminate the franchisee's relationship except as set forth in the [PMPA]."  *Halder,* 642 F.2d at 109.  The district court concluded that Chevron did not violate the PMPA because there was no discontinuation (that is, "nonrenewal") of the franchise relationship.  *Id*.  Halder appealed.

In affirming the lower court's decision, the Sixth Circuit found that Chevron and Halder, in fact, continued the franchise relationship under the provisions of the expired franchise on a month-to-month basis. *Halder,* 642 F.2d at 111. The Court went on to state that "[c]ontinuation of a relationship is all that the [PMPA] requires . . ." and that

> continuation of the relationship on a month-to-month basis did continue the 'franchise relationship.' Stated in terms of the [PMPA], continuation of the relationship on a month-to-month basis continued 'the respective motor fuel marketing or distribution obligations and responsibilities" of Chevron and Halder 'which result from the marketing of motor fuel under a franchise.'

*Halder,* 642 F.2d at 111-112.

In the instant case, the complaint failed to state a claim for unlawful nonrenewal, for two reasons. First, because the PMPA claim against Anacostia is predicated on a failure to renew the "franchise," it is legally deficient and should be dismissed. The PMPA does not require the renewal of a franchise. Second, as the district court stated, there are no facts recited in the complaint to support a conclusion that no franchise relationship exists between Anacostia and the plaintiff.

In fact, the complaint strongly suggests the continuation of the franchise relationship. In paragraph 26 of the Complaint, for example, plaintiff alleges that "Anacostia has replaced ExxonMobil Oil has Metroil's supplier." App. at 16. It goes on to allege that plaintiff is a "tenant" (Cmplt. at ¶7, 27) under a lease that was assigned by ExxonMobil to Anacostia (*Id.* at ¶21). App. at 3, 14, 16.

It is clear from the complaint that there is a continuing franchise relationship between Anacostia and plaintiff under *some* franchise, whether oral or written, whether for a definite term or an indefinite one.  There is nothing in the complaint to suggest that plaintiff is not leasing the Station and purchasing motor fuels for resale to consumers under the Exxon trademark.  Where, as here, the parties continue to do business, as before, there is no nonrenewal of the "franchise relationship."

"Continuation of a relationship is all that the Act requires . . ."  *Halder v. Standard Oil Co*., 642 F.2d at 111-112.  *See also, e.g., Cinco J, Inc. v. Boeder,* 920 F.2d 296, 299 (5th Cir. 1991); *Cedar Brook Service Station, Inc. v. Chevron U.S.A., Inc*., 746 F.Supp. 268 (E.D.N.Y. 1989); *vac'd* 746 F.Supp. 278 (E.D.N.Y. 1990); aff'd 930 F.2d 908 (2nd Cir. 1991); *cert. denied* 112 S.Ct. 77 (1991).

### D.     The District Court Did Not Err In Dismissing Metroil's Breach Of Contract Claim

The district court properly dismissed Metroil's breach of contract claim for the reasons set forth in its Memorandum Opinion.  App. at 477-480.  Anacostia hereby adopts and incorporates by reference the arguments set forth by Appellee ExxonMobil on this issue.

### CONCLUSION

Based on the foregoing, the district court's dismissal of the complaint for failure to state a claim upon which relief can be granted should be affirmed.

Respectfully Submitted this 20th day of July, 2011.

/s/     Alphonse M. Alfano
Alphonse M. Alfano
BASSMAN, MITCHELL & ALFANO, CHARTERED
1707 L Street, N.W., Suite 560
Washington, D.C.  20036
(202) 466-6502

*Counsel for Appellee Anacostia Realty, LLC*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitation provided in Fed. R. App. 32(a)(7)(B)(i) as follows:   This brief contains 7692 words of Times New Roman (14 font) proportional type, excluding parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).   The word processing software used to prepare this brief was Microsoft Office Word 2007.

　　　　　　　　　　　　 /s/ Alphonse M. Alfano
　　　　　　　　　　 Alphonse M. Alfano
　　　　　　　　　　 BASSMAN, MITCHELL & ALFANO, CHARTERED
　　　　　　　　　　 1707 L Street, N.W., Suite 560
　　　　　　　　　　 Washington, D.C. 20036
　　　　　　　　　　 Tel:  (202) 466-6502
　　　　　　　　　　 Fax:  (202) 331-7510
　　　　　　　　　　 Email:  bma@bmalaw.net

　　　　　　　　　　 Attorneys for Appellee Anacostia Realty, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of July, 2011, a true and correct copy of the foregoing Brief of Appellee Anacostia Realty, LLC was filed with the Clerk of the Court using the CM/ECF System, which CM/ECF System I understand will serve by electronic service the following participant-parties in the CM/ECF System; in addition, I certify that I served two paper copies to each of the following via U.S. mail, postage prepaid:

> Peter H. Gunst, Esq.
> James B. Astrachan, Esq.
> Daniel P. Doty, Esq.
> Julia C. Carolan, Esq.
> ASTRACHAN GUNST & THOMAS, P.C.
> 217 East Redwood Street, Suite 2100
> Baltimore, MD 21202
> Tel: (410) 783-3542
>
> Attorneys for the Appellant
>
>      and
>
> Mark Andrew Klapow, Esq.
> CROWELL & MORING, LLP
> 1001 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004
> Tel: (202) 624-2975
>
> Attorneys for Appellees ExxonMobil Corporation and ExxonMobil Corporation
>
>      //Alphonse M. Alfano//
> Alphonse M. Alfano
> BASSMAN, MITCHELL & ALFANO, CHRTD.
> 1707 L Street, NW, Suite 560
> Washington, DC 20036
> Tel: (202) 466-6502, Fax: (202) 331-7510
> Email: bma@bmalaw.net
>
> Counsel for Appellee Anacostia Realty, LLC

33

# <u>ADDENDUM OF STATUTES</u>

**<u>Statute</u>**                                                                      **<u>Page</u>**

Retail Service Station Amendment Act of 2009........................................................1

Petroleum Marketing Practices Act
      15 U.S.C. §§ 2801-2802, 2804-2806..............................................................8

# Retail Service Station Amendment Act of 2009

District of Columbia Official Code 2001 Edition Currentness
  Division V. Local Business Affairs
    Title 36. Trade Practices. (Refs & Annos)
      ▧ Chapter 3. Retail Service Stations.
        ▧ Subchapter IV-A. Franchisee Purchase Rights.
          ➡ § 36-304.11. Definitions.

For the purposes of this subchapter, the term:

(1) "Franchise" means any contract between a refiner and a distributor or between a refiner and a retailer, under which a refiner authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of gasoline, diesel, gasohol, or aviation fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies fuel to the distributor which authorizes or permits such use. The term "franchise" includes the following:

(A) Any contract under which a retailer or distributor is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies fuel to the distributor which authorizes or permits such occupancy;

(B) Any contract pertaining to the supply of fuel which is to be sold, consigned, or distributed under a trademark owned or controlled by a refiner; and

(C) The unexpired portion of any franchise, as defined by this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of District law which permits such transfer or assignment without regard to any provision of the franchise.

(2) "Franchisee" means a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of fuel.

(3) "Franchise relationship" means the respective fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee that result from the marketing of fuel under a franchise.

(4) "Franchisor" means a refiner that authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of fuel.

(5) "Leased marketing premises" means marketing premises owned by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of fuel.

(6) "Refiner" means any person engaged in the refining of crude oil to produce fuel, and includes any affiliate of such person.

(7) "Retailer" means any person who purchases fuel for sale to the general public for ultimate consumption.

CREDIT(S)

(Apr. 19, 1977, D.C. Law 1-123, § 5A-301, as added July 18, 2005, D.C. Law 18-35, § 2(b), 56 DCR 4282.)

HISTORICAL AND STATUTORY NOTES

Legislative History of Laws

Law 18-35, the "Retail Service Station Amendment Act of 2009", was introduced in Council and assigned Bill No. 18-88, which was referred to the Committee of the Whole. The Bill was adopted on first and second readings on April 21, 2009, and May 5, 2009, respectively. Signed by the Mayor on May 21, 2009, it was assigned Act No. 18-86 and transmitted to both Houses of Congress for its review. D.C. Law 18-35 became effective on July 18, 2009.

Miscellaneous Notes

Section 3 of D.C. Law 18-35 provides:

"Section 2(b) [enacting this subchapter] shall expire on January 1, 2011."

DC CODE § 36-304.11

Current through November 19, 2009

Copyright (C) 2009 By The District of Columbia. All Rights Reserved.

END OF DOCUMENT

District of Columbia Official Code 2001 Edition Currentness
  Division V. Local Business Affairs
    Title 36. Trade Practices. (Refs & Annos)
      🗐 Chapter 3. Retail Service Stations.
        🗐 Subchapter IV-A. Franchisee Purchase Rights.
          ➡ **§ 36-304.12. Franchisee's right of first refusal.**

(a) In the case of leased marketing premises as to which the franchisor owns a fee interest, the franchisor shall not sell, transfer, or assign to another person the franchisor's interest in the premises unless the franchisor has first either made a bona fide offer to sell, transfer, or assign to the franchisee the franchisor's interest in the premises, other than signs displaying the franchisor's insignia and any other trademarked, servicemarked, copyrighted, or patented items of the franchisor, or, if applicable, offered to the franchisee a right of first refusal of any bona fide offer acceptable to the franchisor made by another person to purchase the franchisor's interest in the premises. A franchisee shall have 60 days in which to accept or reject a bona fide offer.

(b) This section shall not require a franchisor to continue an existing franchise agreement or to renew a franchise relationship if not otherwise required by federal law.

(c) In the event of the sale, transfer, or assignment of the franchisor's interest in more than one leased marketing premises, a bona fide offer made under this section for each leased marketing premises shall be determined based upon the fair market value that is reasonably attributable to it.

CREDIT(S)

(Apr. 19, 1977, D.C. Law 1-123, § 5A-302, as added July 18, 2005, D.C. Law 18-35, § 2(b), 56 DCR 4282.)

HISTORICAL AND STATUTORY NOTES

Legislative History of Laws

For Law 18-35, see notes following § 36-304.11.

DC CODE § 36-304.12

Current through November 19, 2009

Copyright (C) 2009 By The District of Columbia. All Rights Reserved.

END OF DOCUMENT

District of Columbia Official Code 2001 Edition Currentness
  Division V. Local Business Affairs
    Title 36. Trade Practices. (Refs & Annos)
      🗐 Chapter 3. Retail Service Stations.
       🗐 Subchapter IV-A. Franchisee Purchase Rights.
      ➡ **§ 36-304.13. Duty of good faith in negotiating lease terms.**

     If a franchisor sells, transfers, or assigns to another person the franchisor's interest in the leased marketing premises to a distributor or other third party, that person shall be required to negotiate in good faith reasonable lease terms with the franchisee when renewing the franchise. It shall be *prima facie* evidence of good faith for a distributor to calculate a franchisee's rent using a formula based upon a percentage of the return on the property's value plus fixed costs and use that formula to calculate rents for all of the distributor's franchise relationships in a single geographical market area.

     CREDIT(S)

     (Apr. 19, 1977, D.C. Law 1-123, § 5A-303, as added July 18, 2005, D.C. Law 18-35, § 2(b), 56 DCR 4282.)

     HISTORICAL AND STATUTORY NOTES

     Legislative History of Laws

     For Law 18-35, see notes following § 36-304.11.

     DC CODE § 36-304.13

     Current through November 19, 2009

     Copyright (C) 2009 By The District of Columbia. All Rights Reserved.

     END OF DOCUMENT

District of Columbia Official Code 2001 Edition Currentness
  Division V. Local Business Affairs
    Title 36. Trade Practices. (Refs & Annos)
      ⌕ Chapter 3. Retail Service Stations.
        ⌕ Subchapter IV-A. Franchisee Purchase Rights.
          ➡ **§ 36-304.14. Remedy for violation of subchapter.**

(a) Any person who violates any provision of this subchapter may be sued in the Superior Court of the District of Columbia for temporary and permanent injunctive relief and damages, if any, and the costs of suit.

(b) No action shall be maintained to enforce any liability created under any provision of this subchapter unless brought before the expiration of 2 years after the violation upon which it is based or the expiration of one year after the discovery of the facts constituting such violation, whichever occurs first.

CREDIT(S)

(Apr. 19, 1977, D.C. Law 1-123, § 5A-304, as added July 18, 2005, D.C. Law 18-35, § 2(b), 56 DCR 4282.)

HISTORICAL AND STATUTORY NOTES

Legislative History of Laws

For Law 18-35, see notes following § 36-304.11.

DC CODE § 36-304.14

Current through November 19, 2009

Copyright (C) 2009 By The District of Columbia. All Rights Reserved.

END OF DOCUMENT

District of Columbia Official Code 2001 Edition Currentness
  Division V. Local Business Affairs
    Title 36. Trade Practices. (Refs & Annos)
      🗐 Chapter 3. Retail Service Stations.
        🗐 Subchapter IV-A. Franchisee Purchase Rights.
       ➡ **§ 36-304.15 Applicability.**

This subchapter shall not apply to any sale of leased marketing premises made pursuant to a contract which has been executed by duly authorized representatives of the parties prior to April 1, 2009.

CREDIT(S)

(Apr. 19, 1977, D.C. Law 1-123, § 5A-305, as added July 18, 2005, D.C. Law 18-35, § 2(b), 56 DCR 4282.)

HISTORICAL AND STATUTORY NOTES

Legislative History of Laws

For Law 18-35, see notes following § 36-304.11.

DC CODE § 36-304.15

Current through November 19, 2009

Copyright (C) 2009 By The District of Columbia. All Rights Reserved.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.                    7

# Petroleum Marketing Practices Act
# 15 U.S.C. §§2801-2802, 2804-2806

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective: December 20, 2007**

United States Code Annotated Currentness
 Title 15. Commerce and Trade
  Chapter 55. Petroleum Marketing Practices (Refs & Annos)
   Subchapter I. Franchise Protection
   ➡ **§ 2801. Definitions**

As used in this subchapter:

**(1)(A)** The term "franchise" means any contract--

 **(i)** between a refiner and a distributor,

 **(ii)** between a refiner and a retailer,

 **(iii)** between a distributor and another distributor, or

 **(iv)** between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

 **(B)** The term "franchise" includes--

  **(i)** any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

  **(ii)** any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed--

   **(I)** under a trademark owned or controlled by a refiner; or

   **(II)** under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and

   **(iii)** the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

  **(2)** The term "franchise relationship" means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

  **(3)** The term "franchisor" means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.   9

**(4)** The term "franchisee" means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**(5)** The term "refiner" means any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person.

**(6)** The term "distributor" means any person, including any affiliate of such person, who--

    **(A)** purchases motor fuel for sale, consignment, or distribution to another; or

    **(B)** receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier.

**(7)** The term "retailer" means any person who purchases motor fuel for sale to the general public for ultimate consumption.

**(8)** The term "marketing premises" means, in the case of any franchise, premises which, under such franchise, are to be employed by the franchisee in connection with sale, consignment, or distribution of motor fuel.

**(9)** The term "leased marketing premises" means marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

**(10)** The term "contract" means any oral or written agreement. For supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels.

**(11)** The term "trademark" means any trademark, trade name, service mark, or other identifying symbol or name.

**(12)** The term "motor fuel" means gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads, and highways.

**(13)** The term "failure" does not include--

    **(A)** any failure which is only technical or unimportant to the franchise relationship;

    **(B)** any failure for a cause beyond the reasonable control of the franchisee; or

    **(C)** any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).

**(14)** The terms "fail to renew" and "nonrenewal" mean, with respect to any franchise relationship, a failure to reinstate, continue, or extend the franchise relationship--

    **(A)** at the conclusion of the term, or on the expiration date, stated in the relevant franchise;

    **(B)** at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date; or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.     10

**(C)** following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978, and has not been renewed after such date.

**(15)** The term "affiliate" means any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person.

**(16)** The term "relevant geographic market area" includes a State or a standard metropolitan statistical area as periodically established by the Office of Management and Budget.

**(17)** The term "termination" includes cancellation.

**(18)** The term "commerce" means any trade, traffic, transportation, exchange, or other commerce--

**(A)** between any State and any place outside of such State; or

**(B)** which affects any trade, transportation, exchange, or other commerce described in subparagraph (A).

**(19)** The term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and any other commonwealth, territory, or possession of the United States.

CREDIT(S)

(Pub.L. 95-297, Title I, § 101, June 19, 1978, 92 Stat. 322; Pub.L. 103-371, § 6, Oct. 19, 1994, 108 Stat. 3486; Pub.L. 110-140, Title II, § 241(c)(1), Dec. 19, 2007, 121 Stat. 1540.)

Current through P.L. 112-23 approved 6-29-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    ⌐▤ Chapter 55. Petroleum Marketing Practices (Refs & Annos)
      ⌐▤ Subchapter I. Franchise Protection
        ➡ **§ 2802. Franchise relationship**

(a) General prohibition against termination or nonrenewal

Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may--

    **(1)** terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

    **(2)** fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

(b) Precondition and grounds for termination or nonrenewal

    **(1)** Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if--

    **(A)** the notification requirements of section 2804 of this title are met; and

    **(B)** such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

    **(2)** For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

    **(A)** A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure--

    **(i)** not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

    **(ii)** not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

    **(B)** A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if--

    **(i)** the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

    **(ii)** such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.                    12

**(C)** The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence--

**(i)** not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

**(ii)** not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

**(D)** An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship, if--

**(i)** such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;

**(ii)** the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804(d) of this title; and

**(iii)** within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement.

**(E)** In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if--

**(i)** such determination--

**(I)** was made after the date such franchise was entered into or renewed, and

**(II)** was based upon the occurrence of changes in relevant facts and circumstances after such date;

**(ii)** the termination or nonrenewal is not for the purpose of converting the premises, which are the subject of the franchise, to operation by employees or agents of the franchisor for such franchisor's own account; and

**(iii)** in the case of leased marketing premises--

**(I)** the franchisor, during the 180-day period after notification was given pursuant to section 2804 of this title, either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises; or

**(II)** in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor's interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.    13

then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

(3) For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if--

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

(B) The receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if--

(i) the franchisee was promptly apprised of the existence and nature of such complaints following receipt of such complaints by the franchisor; and

(ii) if such complaints related to the condition of such premises or to the conduct of any employee of such franchisee, the franchisee did not promptly take action to cure or correct the basis of such complaints.

(C) A failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures.

(D) In the case of any franchise entered into prior to June 19, 1978, (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if--

(i) such determination is--

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or

(IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

(ii) with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this title, either--

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

(c) Definition

As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as--

(1) fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises;

(2) declaration of bankruptcy or judicial determination of insolvency of the franchisee;

(3) continuing severe physical or mental disability of the franchisee of at least 3 months duration which renders the franchisee unable to provide for the continued proper operation of the marketing premises;

(4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if--

(A) the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise-

(i) of the duration of the underlying lease; and

(ii) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal);

(B) during the 90-day period after notification was given pursuant to section 2804 of this title, the franchisor offers to assign to the franchisee any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor, except that the franchisor may condition the assignment upon receipt by the franchisor of--

(i) an unconditional release executed by both the landowner and the franchisee releasing the franchisor from any and all liability accruing after the date of the assignment for--

(I) financial obligations under the option (or the resulting extended lease or purchase agreement);

(II) environmental contamination to (or originating from) the marketing premises; or

(III) the operation or condition of the marketing premises; and

(ii) an instrument executed by both the landowner and the franchisee that ensures the franchisor and the contractors of the franchisor reasonable access to the marketing premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises; and

(C) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession (through an assignment pursuant to subparagraph (B) or by obtaining a new lease or purchasing the marketing premises from the landowner), the franchisor (if requested in writing by the franchisee not later than 30 days after notification was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.                    15

given pursuant to section 2804 of this title), during the 90-day period after notification was given pursuant to section 2804 of this title--

    **(i)** made a bona fide offer to sell, transfer, or assign to the franchisee the interest of the franchisor in any improvements or equipment located on the premises; or

    **(ii)** if applicable, offered the franchisee a right of first refusal (for at least 45 days) of an offer, made by another person, to purchase the interest of the franchisor in the improvements and equipment.

    **(5)** condemnation or other taking, in whole or in part, of the marketing premises pursuant to the power of eminent domain;

    **(6)** loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor;

    **(7)** destruction (other than by the franchisor) of all or a substantial part of the marketing premises;

    **(8)** failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;

    **(9)** failure by the franchisee to operate the marketing premises for--

    **(A)** 7 consecutive days, or

    **(B)** such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

    **(10)** willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

    **(11)** knowing failure of the franchisee to comply with Federal, State, or local laws or regulations relevant to the operation of the marketing premises; and

    **(12)** conviction of the franchisee of any felony involving moral turpitude.

(d) Compensation, etc., for franchisee upon condemnation or destruction of marketing premises

In the case of any termination of a franchise (entered into or renewed on or after June 19, 1978), or in the case of any nonrenewal of a franchise relationship (without regard to the date on which such franchise relationship was entered into or renewed)--

    **(1)** if such termination or nonrenewal is based upon an event described in subsection (c)(5) of this section, the franchisor shall fairly apportion between the franchisor and the franchisee compensation, if any, received by the franchisor based upon any loss of business opportunity or good will; and

    **(2)** if such termination or nonrenewal is based upon an event described in subsection (c)(7) of this section and the leased marketing premises are subsequently rebuilt or replaced by the franchisor and operated under a franchise, the franchisor shall, within a reasonable period of time, grant to the franchisee a right of first refusal of the franchise under which such premises are to be operated.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.     16

CREDIT(S)

(Pub.L. 95-297, Title I, § 102, June 19, 1978, 92 Stat. 324; Pub.L. 103-371, §§ 2, 3, Oct. 19, 1994, 108 Stat. 3484.)

Current through P.L. 112-23 approved 6-29-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 55. Petroleum Marketing Practices (Refs & Annos)
      Subchapter I. Franchise Protection
        ➡ **§ 2804. Notification of termination or nonrenewal of franchise relationship**

(a) General requirements applicable to franchisor

Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship--

**(1)** in the manner described in subsection (c) of this section; and

**(2)** except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.

(b) Additional requirements applicable to franchisor

**(1)** In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section--

**(A)** such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable; and

**(B)** in the case of leased marketing premises, such franchisor--

**(i)** may not establish a new franchise relationship with respect to such premises before the expiration of the 30-day period which begins--

**(I)** on the date notification was posted or personally delivered, or

**(II)** if later, on the date on which such termination or nonrenewal takes effect; and

**(ii)** may, if permitted to do so by the franchise agreement, repossess such premises and, in circumstances under which it would be reasonable to do so, operate such premises through employees or agents.

**(2)** In the case of any termination of any franchise or any nonrenewal of any franchise relationship pursuant to the provisions of section 2802(b)(2)(E) of this title or section 2803(c)(2) of this title, the franchisor shall--

**(A)** furnish notification to the franchisee not less than 180 days prior to the date on which such termination or nonrenewal takes effect; and

**(B)** promptly provide a copy of such notification, together with a plan describing the schedule and conditions under which the franchisor will withdraw from the marketing of motor fuel through retail outlets in the relevant geographic area, to the Governor of each State which contains a portion of such area.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.    18

(c) Manner and form of notification

Notification under this section--

  **(1)** shall be in writing;

  **(2)** shall be posted by certified mail or personally delivered to the franchisee; and

  **(3)** shall contain--

    **(A)** a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;

    **(B)** the date on which such termination or nonrenewal takes effect; and

    **(C)** the summary statement prepared under subsection (d) of this section.

(d) Preparation, publication, etc., of statutory summaries

  **(1)** Not later than 30 days after June 19, 1978, the Secretary of Energy shall prepare and publish in the Federal Register a simple and concise summary of the provisions of this subchapter, including a statement of the respective responsibilities of, and the remedies and relief available to, any franchisor and franchisee under this subchapter.

  **(2)** In the case of summaries required to be furnished under the provisions of section 2802(b)(2)(D) of this title or subsection (c)(3)(C) of this section before the date of publication of such summary in the Federal Register, such summary may be furnished not later than 5 days after it is so published rather than at the time required under such provisions.

CREDIT(S)

(Pub.L. 95-297, Title I, § 104, June 19, 1978, 92 Stat. 329.)

Current through P.L. 112-23 approved 6-29-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective: December 20, 2007**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 55. Petroleum Marketing Practices (Refs & Annos)
      Subchapter I. Franchise Protection
      ➡ **§ 2805. Enforcement provisions**

(a) Maintenance of civil action by franchisee against franchisor; jurisdiction and venue; time for commencement of action

If a franchisor fails to comply with the requirements of section 2802, 2803, or 2807 of this title, the franchisee may maintain a civil action against such franchisor. Such action may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business, except that no such action may be maintained unless commenced within 1 year after the later of--

**(1)** the date of termination of the franchise or nonrenewal of the franchise relationship; or

**(2)** the date the franchisor fails to comply with the requirements of section 2802, 2803, or 2807 of this title.

(b) Equitable relief by court; bond requirements; grounds for nonexercise of court's equitable powers

**(1)** In any action under subsection (a) of this section, the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 2802, 2803, or 2807 of this title, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.

**(2)** Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if--

**(A)** the franchisee shows--

**(i)** the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

**(ii)** there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

**(B)** the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

**(3)** Nothing in this subsection prevents any court from requiring the franchisee in any action under subsection (a) of this section to post a bond, in an amount established by the court, prior to the issuance or continuation of any equitable relief.

**(4)** In any action under subsection (a) of this section, the court need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was commenced--

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.                  20

**(A)** more than 90 days after the date on which notification pursuant to section 2804(a) of this title was posted or personally delivered to the franchisee;

**(B)** more than 180 days after the date on which notification pursuant to section 2804(b)(2) of this title was posted or personally delivered to the franchisee; or

**(C)** more than 30 days after the date on which the termination of such franchise or the nonrenewal of such franchise relationship takes effect if less than 90 days notification was provided pursuant to section 2804(b)(1) of this title.

(c) Burden of proof; burden of going forward with evidence

In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title, and, if applicable, that such franchisor complied with the requirements of section 2802(d) of this title.

(d) Actual and exemplary damages and attorney and expert witness fees to franchisee; determination by court of right to exemplary damages and amount; attorney and expert witness fees to franchisor for frivolous actions

**(1)** If the franchisee prevails in any action under subsection (a) of this section, such franchisee shall be entitled--

**(A)** consistent with the Federal Rules of Civil Procedure, to actual damages;

**(B)** in the case of any such action which is based upon conduct of the franchisor which was in willful disregard of the requirements of section 2802, 2803, or 2807 of this title, or the rights of the franchisee thereunder, to exemplary damages, where appropriate; and

**(C)** to reasonable attorney and expert witness fees to be paid by the franchisor, unless the court determines that only nominal damages are to be awarded to such franchisee, in which case the court, in its discretion, need not direct that such fees be paid by the franchisor.

**(2)** The question of whether to award exemplary damages and the amount of any such award shall be determined by the court and not by a jury.

**(3)** In any action under subsection (a) of this section, the court may, in its discretion, direct that reasonable attorney and expert witness fees be paid by the franchisee if the court finds that such action is frivolous.

(e) Discretionary power of court to compel continuation or renewal of franchise relationship; grounds for noncompulsion; right of franchisee to actual damages and attorney and expert witness fees unaffected

**(1)** In any action under subsection (a) of this section with respect to a failure of a franchisor to renew a franchise relationship in compliance with the requirements of section 2802 of this title, the court may not compel a continuation or renewal of the franchise relationship if the franchisor demonstrates to the satisfaction of the court that--

**(A)** the basis for such nonrenewal is a determination made by the franchisor in good faith and in the normal course of business--

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.                21

**(i)** to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

**(ii)** to materially alter, add to, or replace such premises,

**(iii)** to sell such premises,

**(iv)** to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, or

**(v)** that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee; and

**(B)** the requirements of section 2804 of this title have been complied with.

**(2)** The provisions of paragraph (1) shall not affect any right of any franchisee to recover actual damages and reasonable attorney and expert witness fees under subsection (d) of this section if such nonrenewal is prohibited by section 2802 of this title.

(f) Release or waiver of rights

**(1)** No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive--

**(A)** any right that the franchisee has under this subchapter or other Federal law; or

**(B)** any right that the franchisee may have under any valid and applicable State law.

**(2)** No provision of any franchise shall be valid or enforceable if the provision specifies that the interpretation or enforcement of the franchise shall be governed by the law of any State other than the State in which the franchisee has the principal place of business of the franchisee.

CREDIT(S)

(Pub.L. 95-297, Title I, § 105, June 19, 1978, 92 Stat. 331; Pub.L. 103-371, § 4, Oct. 19, 1994, 108 Stat. 3485; Pub.L. 110-140, Title II, § 241(b), Dec. 12, 2007, 121 Stat. 1540.)

Current through P.L. 112-23 approved 6-29-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
      Chapter 55. Petroleum Marketing Practices (Refs & Annos)
        Subchapter I. Franchise Protection
          ➡ **§ 2806. Relationship of statutory provisions to State and local laws**

(a) Termination or nonrenewal of franchise

**(1)** To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

**(2)** No State or political subdivision of a State may adopt, enforce, or continue in effect any provision of law (including a regulation) that requires a payment for the goodwill of a franchisee on the termination of a franchise or nonrenewal of a franchise relationship authorized by this subchapter.

(b) Transfer or assignment of franchise

**(1)** Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

**(2)** Nothing in this subchapter shall prohibit any State from specifying the terms and conditions under which any franchise or franchise relationship may be transferred to the designated successor of a franchisee upon the death of the franchisee.

CREDIT(S)

(Pub.L. 95-297, Title I, § 106, June 19, 1978, 92 Stat. 332; Pub.L. 103-371, § 5, Oct. 19, 1994, 108 Stat. 3485.)

Current through P.L. 112-23 approved 6-29-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.